**Laurie L. ABRAHAM, Appellant,**

v.

**GRAPHIC ARTS INTERNATIONAL UNION, et al.**

No. 79–1796.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1980.

Decided Aug. 14, 1981.

---

James W. Hunt, Washington, D. C., for appellant.

Martin R. Ganzglass, Washington, D. C., for appellee.

Before ROBINSON, Chief Judge, WRIGHT, Circuit Judge, and AUBREY E. ROBINSON, JR.* District Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

The District Court entered a summary judgment dismissing appellant's employment discrimination suit, agreeing with the parties that no fact material to adjudication of the litigation was actually in controversy. Our examination of the record convinces us, however, that there are issues of fact critical to any disposition. Accordingly, we reverse the judgment of dismissal and remand the case for trial.

I

. On June 30, 1975, appellee Graphic Arts International Union entered into a fifteen-month contract with the Department of Labor, pursuant to which the Department provided the union with funds to operate an on-the-job training program—the "Project for Equal Progression" (PEP)—for women entering the graphic arts industry.[1] This financial support included salaries for two full-time employees, a project coordinator and an administrative assistant, to manage the program.[2] The contract was subsequently extended for an additional eleven months, through August, 1977.[3]

Appellant Laurie Abraham was hired as administrative assistant in late March, 1976. By her version, she was assured employment for as long as the project received funding.[4] During the course of her employ she received no adverse comment concerning her competence,[5] and on April 1, 1977, she was given a substantial raise in pay.[6]

In February, 1977, however, appellant had informed her superior that she was pregnant and that she expected her child in September.[7] She reiterated this in June and inquired as to the permissible length of maternity leave, but never got a definite answer.[8] While the union—unbeknownst to appellant—decided in June or July to terminate her employment,[9] on August 5 she departed on what she believed to be that leave.[10]

Meanwhile, the union entered into a new contract with the Department of Labor extending the training program through August, 1977.[11] During negotiations therefor, the union proposed additional responsibilities for the administrative assistant's position.[12] The Department apparently approved,[13] although the new contract did not expressly incorporate the changes.[14]

At any rate, on September 10, 1977, appellant was informed of the union's decision to terminate her.[15] In October she filed a sex-discrimination charge with the Equal Employment Opportunity Commission,[16]

1. Appendix (App.) 160–173.

2. App. 167–168.

3. See App. 226 (affidavit of Beryl Brown).

4. App. 248 (affidavit of Laurie Abraham).

5. App. 249 (affidavit of Laurie Abraham). See note 43 *infra*.

6. App. 249 (affidavit of Laurie Abraham). See note 43 *infra*.

7. App. 249 (affidavit of Laurie Abraham).

8. App. 249 (affidavit of Laurie Abraham). See text *infra* at notes 68–73.

9. App. 98, 136.

10. App. 66, 250 (affidavit of Laurie Abraham). Since 1972, the union has provided maternity leave to its full-time employees, App. 229, and apparently it had discretion to accord that benefit to those employed in the training program. See App. 104, 105.

11. App. 205–219.

12. App. 193–194. See note 41 *infra*.

13. App. 264 (affidavit of Beryl Brown).

14. See App. 205–219.

15. App. 250 (affidavit of Laurie Abraham). See note 42 *infra*.

16. App. 14. Appellant also filed an unfair labor practice charge with the National Labor Relations Board. This was rejected. App. 29, 25, 86. The Board's action was challenged in the District Court, but was summarily dismissed. *Abraham v. Graphic Arts Int'l Union,* Civ.No. 78–0823 (D.D.C. May 23, 1979) (order and memorandum) at 3–5, App. 4–6. That determination is not before us.

which made no determination on the merits but issued a right-to-sue letter.[17] When no further administrative action was forthcoming, appellant instituted an action in the District Court, where again she was left without relief. The court, perceiving no issue of material fact, concluded that appellant had not made out a prima facie case of employment discrimination because, on its reading of the record, she was not qualified for the administrative assistant's job as redefined.[18] Even granting the existence of a prima facie case, the court continued, the union had rebutted it through a showing of legitimate business necessity: appellant, the court said, "gave no indication of the length of time she would require nor of the time she thought she would depart.... Under these circumstances, [the union] had no choice but to hire someone who could commit herself to the project for the duration of the grant."[19] This appeal then ensued.

## II

The District Court made its rulings on cross-motions for summary judgment.[20] The principles then governing are thoroughly settled.[21] Summary judgment is appropriate only on demonstration "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[22] The court's function is not to try disputed issues of fact, but only to ascertain whether such an issue is present,[23] and any doubt on that score is to be resolved against the movant.[24] Since it is he who bears the onus of establishing his entitlement to summary judgment,[25] his opponent enjoys the benefit of all favorable inferences from the evidence proffered;[26] moreover, facts asserted by the non-movant, if adequately buttressed by evidentiary material,[27] are to be taken as true.[28] These canons apply as forcefully on

17. App. 19.

18. *Abraham v. Graphic Arts Int'l Union* (memorandum), *supra* note 16, at 6–8, App. 7-9. The court also concluded that appellant's replacement was better qualified. *Id.* at 7–8, App. 8-9.

19. *Id.* at 8, App. 9.

20. *Abraham v. Graphic Arts Int'l Union* (memorandum), *supra* note 16, at 1, App. 2.

21. See generally 6 J. Moore & J. Wicker, Federal Practice ¶¶ 56.01 *et seq.* (2d ed. 1976 & 1980); 10 C. Wright & A. Miller, Federal Practice §§ 2711 *et seq.* (1973).

22. Fed.R.Civ.P. 56(c).

23. *Bouchard v. Washington,* 168 U.S.App.D.C. 402, 405, 514 F.2d 824, 827 (1975); *Weiss v. Kay Jewelry Stores, Inc.,* 152 U.S.App.D.C. 350, 352, 470 F.2d 1259, 1261 (1972); *Leonard v. BHJK Corp.,* 152 U.S.App.D.C. 97, 99, 469 F.2d 108, 110 (1972); *Nyhus v. Travel Management Corp.,* 151 U.S.App.D.C. 269, 271, 466 F.2d 440, 442 (1972).

24. *Bouchard v. Washington, supra* note 23, 168 U.S.App.D.C. at 405, 514 F.2d at 827; *Washington v. Cameron,* 133 U.S.App.D.C. 391, 396, 411 F.2d 705, 710 (1969); *Hoffman v. Partridge,* 84 U.S.App.D.C. 224, 225, 172 F.2d 275, 276 (1949); *Wittlin v. Giacalone,* 81 U.S.App.D.C. 20, 21, 154 F.2d 20, 21 (1946).

25. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970); *Bouchard v. Washington, supra* note 23, 168 U.S.App.D.C. at 405, 514 F.2d at 827; *Leonard v. BHJK Corp., supra* note 23, 152 U.S.App.D.C. at 99, 469 F.2d at 110; *Nyhus v. Travel Management Corp., supra* note 23, 151 U.S.App.D.C. at 271, 466 F.2d at 442; *Washington v. Cameron, supra* note 24, 133 U.S.App. D.C. at 395, 411 F.2d at 709.

26. *Adickes v. S. H. Kress & Co., supra* note 25, 398 U.S. at 157, 90 S.Ct. at 1608, 26 L.Ed.2d at 154; *Bouchard v. Washington, supra* note 23, 168 U.S.App.D.C. at 405, 514 F.2d at 827; *Leonard v. BHJK Corp., supra* note 23, 152 U.S.App.D.C. at 99, 469 F.2d at 110; *Nyhus v. Travel Management Corp., supra* note 23, 151 U.S.App.D.C. at 271, 466 F.2d at 442.

27. See generally Fed.R.Civ.P. 56(c), (e), (f); 6 J. Moore & J. Wicker, Federal Practice ¶¶ 56.11, 56.22–56.24 (2d ed. 1976 & 1980); 10 C. Wright & A. Miller, Federal Practice §§ 2721–2724, 2738–2741 (1973).

28. *First Nat'l Bank v. Pepper,* 454 F.2d 626, 629 (2d Cir. 1972); *Scott v. Plante,* 532 F.2d 939, 945 (3d Cir. 1976); *Computer Servicenters, Inc. v. Beacon Mfg. Co.,* 443 F.2d 906, 907 (4th Cir. 1971); *Day v. UMW Local 36,* 466 F.2d 83, 86 (6th Cir. 1972).

appellate review as earlier they did at the trial level.[29]

■ Appellant lays her demands on Title VII of the Civil Rights Act of 1964.[30] Synthesis of a Title VII claim of disparate treatment—the grievance here—may be a three-step process, in which the burden of producing evidence shifts at each step.[31] The complainant first must establish a prima facie case of discrimination.[32] The employer, in turn, must come forward with some legitimate, nondiscriminatory reason for the treatment accorded.[33] The complainant may then show that the reason advanced is no more than a pretext for the discrimination asserted.[34] That analytical approach was to be taken here, of course, in the context of the summary disposition the District Court was asked to make. The court's task was to ascertain, successively at

each stage reached, whether any issue of material fact emerged authentically and, if not, whether the case called for judgment as a matter of law.[35] Summary judgment was in order only if all facts essential to the Title VII claim or defense were free from genuine dispute, and all that remained was decision on a matter of law.[36] Our mission on this appeal is to determine whether the District Court observed these fundamental requirements.[37]

## III

We find that the union's summary judgment cannot be sustained on the theory that appellant failed to make out a prima facie case of sex discrimination. The District Court had grave doubts that she had done so, for two closely related reasons.[38] One was the court's feeling that appellant

29. The record on appeal is to be read in the light most advantageous to the party resisting summary judgment. *Poller v. CBS*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962); *Ring v. Schlesinger*, 164 U.S.App.D.C. 19, 30 n.16, 502 F.2d 479, 490 n.16 (1974); *Libby v. L. J. Corp.*, 101 U.S.App.D.C. 87, 90, 247 F.2d 78, 81 (1957); *Snyder v. Hillegeist*, 100 U.S.App.D.C. 368, 370, 246 F.2d 649, 651 (1957). When properly supported, his evidentiary claims are to be accepted, *Bishop v. Wood*, 426 U.S. 341, 347, 96 S.Ct. 2074, 2078–2079, 48 L.Ed.2d 684, 691–692 (1976); *Overseas Media Corp. v. McNamara*, 128 U.S.App.D.C. 48, 50 n.3, 385 F.2d 308, 310 n.3 (1967); *Murray v. Lichtman*, 119 U.S.App.D.C. 250, 252, 339 F.2d 749, 751 (1964); *Kennedy v. Robb*, 547 F.2d 408, 410 (8th Cir. 1976), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977), as are his versions of the operative facts. *Jobson v. Henne*, 355 F.2d 129, 132–133 (2d Cir. 1966); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979); *Johnson Farm Equip. Co. v. Cook*, 230 F.2d 119, 123 (8th Cir. 1956); *Stevens v. Barnard*, 512 F.2d 876, 878 (10th Cir. 1975). The appellate court must determine whether there was any issue of fact material to the summary judgment awarded, and if so must reverse it. *Emmett v. Eastern Dispensary & Cas. Hosp.*, 130 U.S.App.D.C. 50, 52–53 & n.8, 396 F.2d 931, 933–934 & n.8 (1967); *Davidson v. Coyne*, 120 U.S.App.D.C. 377, 378, 347 F.2d 471, 472 (1965); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 773 (3d Cir. 1976); *Blum v. Schuyler Packing Co.*, 508 F.2d 881, 883 (8th Cir. 1974). Substantive decisionmaking is limited to questions of law, see Fed.R.Civ.P. 56(c), and resolution of factual disputes is taboo. See *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994,

8 L.Ed.2d 176, 177 (1962); *Carr v. Corning*, 86 U.S.App.D.C. 173, 180, 182 F.2d 14, 21 (1950); *Ed Houser Enterprises, Inc. v. General Motors Corp.*, 595 F.2d 366, 368 (7th Cir. 1978); *Pacific Fruit Express Co. v. Akron, C. & Y. R.R.*, 524 F.2d 1025, 1029 (9th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976).

30. Pub.L.No.88–352, tit. VII, §§ 701 *et seq.*, 78 Stat. 253 (1964), as amended, 42 U.S.C. §§ 2000e *et seq.* (1976) [hereinafter cited as codified].

31. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668, 677–679 (1973). See also *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

32. *McDonnell Douglas Corp. v. Green, supra* note 31, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

33. *Id.*

34. *Id.* at 804–805, 93 S.Ct. at 1825, 36 L.Ed.2d at 679.

35. See text *supra* at note 22.

36. See text *supra* at notes 22–29.

37. See note 29 *supra*.

38. *Abraham v. Graphic Arts Int'l Union* (memorandum), *supra* note 16, at 6, App. 7. See also *id.* at 8, App. 9.

was not qualified to serve as administrative assistant in the PEP program, as that position was redefined for the 1977 extending contract;[39] the other was the court's impression that appellant's successor in that post was more experienced.[40] We cannot accept either of these grounds, for they incorporate resolutions of hotly contested issues of fact.

■ While the union's 1977 redefinition of the administrative assistant's tasks made some increase in duties and responsibilities,[41] the union's unelucidated opinion seemingly was the sole support for the view that appellant could not have measured up to them.[42] And on the other side of the ledger were facts impugning that proposition. Appellant had functioned as PEP's administrative assistant for sixteen months without complaint about her work, engaging in most of the activities required by the revised job description.[43] On the record as

---

**39.** *Id.* at 6–7, App. 7–8.

**40.** *Id.* at 7–8, App. 8–9.

**41.** See text *supra* at notes 12–14. The national project coordinator and her subordinate, the administrative assistant, managed the day-to-day operations of the PEP program. See App. 167–168. Since the coordinator traveled extensively, and was absent from the Washington headquarters about half of the time, App. 133–134, the responsibilities of the administrative assistant frequently became considerably more than clerical in nature. During appellant's tenure, the contract between the union and the Department of Labor originally provided in part that

the Administrative Assistant will become completely familiar with the program and assist the Project Coordinator in program administration. In the absence of the Project Coordinator, the Administrative Assistant will administer the program subject to the approval of the Project Coordinator.

App. 168. When, shortly after appellant began her maternity leave, the term of the program was extended, the duties of the position were redefined by the union, in relevant part as follows:

In the absence of the Project Coordinator, the Administrative Assistant will be authorized to carry out clearly defined logistical management activities and to coordinate contacts between the Education Department, Research Department, Accounting Department and others as necessary. In effect, the orientation of the Administrative Assistant will be more paraprofessional during the proposed contract term in order to provide the needed support for the Project Coordinator.

App. 194. The call for a paraprofessional effectuated the idea of filling the job with "someone with more expertise in the requirements of the position." App. 129–130.

**42.** The letter notifying appellant of her termination stated:

While you were working with the program, it became evident to us that we really needed someone with more skills than you have, particularly in the area of administration. It

is our opinion that a person with normal secretarial and clerical ability simply could not provide us with the administrative backup we needed on a day-to-day basis. This is particularly so in light of [the national project coordinator's] travel out of Washington, D.C.

Accordingly, following the expiration of the Department of Labor contract on August 31, 1977, we entered into a new contract with the Department which more clearly met the needs of our program by providing a para professional [*sic*] for an Administrative Assistant .... I am sorry to have to advise you that under the Department of Labor contract there is no longer a position for you with our office.

App. 251. The letter was signed by Beryl Brown, the national project coordinator at the time, but admittedly was prepared by the union's attorney. App. 137–138. Beryl Brown later avowed in an affidavit that "[t]he contract proposal for the second year, and the contract ultimately entered into between the Department of Labor and the [union], revised the job description of the Administrative Assistant to place greater emphasis upon administrative ability," and that "[t]his revision was the result of [a] meeting ... and a discussion of the need for the program to have a person more qualified in administration than [appellant] had been, in order to run the program while I, as National Project Coordinator, was in the field." App. 227. In a deposition, however, Beryl Brown stated somewhat inconsistently that at no time did she indicate that appellant lacked the qualifications for the job. App. 131–132.

**43.** Appellant became administrative assistant in the PEP program after completing two years of college work and working about a year and a half as a secretary. App. 66. She occupied the position from March 25, 1976, through August 4, 1977, App. 60, 248, 250, administering the program during her superior's frequent absences from the office. App. 119, 248, 249. When Betty Brown, the first national project coordinator, resigned in August, 1976, inquiry was made of appellant as to her interest in that position, before it became evident that it would

so far made, it was an open question whether appellant could have met the additional demands of the position as redefined.[44] And despite the qualifications of appellant's replacement,[45] the fact was that appellant held a wide margin of superiority—sixteen months to none—in experience in administration of the particular contract under which the PEP project was conducted.[46] Appellant was entitled to all favorable inferences afforded by the record,[47] and to the benefit of any doubt as to the propriety of summary judgment for the union.[48] Since the record, in present shape at least, does not 'establish indisputably that appellant was unqualified for the redefined position, or that her handling of the leave problem was unreasonable,[49] the work absence incidental to her impending motherhood loomed as a likely explanation for her discharge. Given that, we conclude that appellant survived the rigors of demonstrat-

ing the potential for a prima facie case at trial.[50]

The legal principles activated at this juncture are relatively straightforward. Title VII declares it to "be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex."[51] This means that, unless indispensably demanded by the job, the gender of an employee cannot be utilized as a factor in a discharge decision,[52] or that the decision rested upon a characteristic peculiar to one of the sexes.[53] Pregnancy and childbirth are, of course, phenomena shared only by women, and only female employees are susceptible to employment losses which may be tied to either. So, if an employer grants employees leave for any and all temporary physical disabilities except pregnancy, and restoration to the employee's former job upon the expira-

---

go to some official of the union. App. 249. At the end of her first year of service, appellant was given a substantial boost in salary on recommendation of the succeeding national project coordinator, Beryl Brown, who later described the raise as an "automatic" cost-of-living increase. App. 64, 154, 249. During the approximate one-year period as appellant's superior, Beryl Brown neither made nor received any complaint about appellant's performance. App. 120, 126, 132, 249. Beryl Brown did have occasion once to mention to appellant that certain forms to be submitted to the Department of Labor had not been properly prepared but that appellant was not to "worry about it." App. 250. It appears that the PEP project, like others funded by the Department of Labor at the time, had encountered problems with forms, and that there was uncertainty as to how they were to be completed, App. 120–122 —so much that after appellant's dismissal, her replacement attended a one-day seminar on preparation of the forms. App. 142–143.

**44.** See notes 42–43 *supra* and accompanying text.

**45.** Appellant's successor had had an unspecified amount of secretarial and administrative experience and familiarity with federal contracts, App. 227, but apparently none with Department of Labor programs. App. 142–143.

**46.** See notes 43, 45 *supra* and accompanying text.

**47.** See text *supra* at notes 26–28.

**48.** See text *supra* at note 24.

**49.** See text *infra* at notes 73 75.

**50.** See *McDonnell Douglas Corp. v. Green, supra* note 31, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677; *Furnco Constr. Co. v. Waters, supra* note 31, 438 U.S. at 575–576, 98 S.Ct. at 2948–2949, 57 L.Ed.2d at 966–967. "[A] Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.' " *Id.* at 576, 98 S.Ct. at 2948–2949, 57 L.Ed.2d at 966–967, quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977).

**51.** 42 U.S.C. § 2000e-2(a)(1) (1976).

**52.** *Barnes v. Costle,* 183 U.S.App.D.C. 90, 97–99, 561 F.2d 983, 990–992 (1977); *Sprogis v. United Airlines, Inc.,* 444 F.2d 1194, 1198 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).

**53.** *Nashville Gas Co. v. Satty,* 434 U.S. 136, 138–143, 98 S.Ct. 347, 349–352, 54 L.Ed.2d 356, 361–365 (1977); *Barnes v. Costle, supra* note 52, 183 U.S.App.D.C. at 97–99 & n.57, 561 F.2d at 990–992 & n.57; *Earwood v. Continental Southeastern Lines, Inc.,* 539 F.2d 1349, 1351 (4th Cir. 1976).

tion of leave, it is apparent that women employees are subject to "a substantial burden that men need not suffer."[54] Title VII outlaws any detrimental visitation on employees of either sex "because of their differing roles in 'the scheme of human existence;'"[55] by the same token, Title VII cannot be read "to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role."[56] It follows that an employer extending job-reinstatement to employees generally after periods of temporary physical indisposition must pursue that policy equally when temporary disability is caused by pregnancy.[57]

The instant case features a slight variant, however. The union has established leave policies for each of its three classes of regular full-time permanent employees,[58] but appellant was a full-time temporary employee, and consequently did not fit into any of these categories.[59] The contract between the union and the Department of Labor provided that employees engaged in the PEP project would have ten days of sick leave and ten days of vacation leave,[60] and the union declares that it had no policy

---

**54.** *Nashville Gas Co. v. Satty, supra* note 53, 434 U.S. at 142, 98 S.Ct. at 351, 54 L.Ed.2d at 364.

**55.** *Id.*, quoting *General Elec. Co. v. Gilbert*, 429 U.S. 125, 139 n.17, 97 S.Ct. 401, 409–410 n.17, 50 L.Ed.2d 343, 356 n.17 (1976).

**56.** *Nashville Gas Co. v. Satty, supra* note 53, 434 U.S. at 142, 98 S.Ct. at 351, 54 L.Ed.2d at 364 (footnote omitted). Subsequent to appellant's discharge, Congress made that plain beyond possibility of any doubt whatsoever insofar as pregnancy and childbirth are concerned. In 1978, Title VII was amended by a provision specifying that

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work. . . .

Pub.L.No.95–555, 92 Stat. 2076 (1978), 42 U.S.C. § 2000e(k) (Supp. III 1979). The purpose of this amendment was "to clarify Congress' intent to include discrimination based on pregnancy, childbirth or related medical conditions in the prohibition against sex discrimination in employment." H.R.Rep.No.95–948, 95th Cong., 2d Sess. 2 (1978), U.S.Code Cong. & Admin.News 4749, 4750. This legislation negates the holding in *General Elec. Co. v. Gilbert, supra* note 55, in favor of the validity of a company's disability insurance plan which excluded coverage for women with pregnancy-related disabilities. It also eliminates the benefit-burden distinction utilized in *Nashville Gas Co. v. Satty, supra* note 53, 434 U.S. at 141–142, 98 S.Ct. at 350–351, 54 L.Ed.2d at 363–364. The amendment "appl[ies] to all aspects of employment—hiring, reinstatement, termination, disability benefits, sick leave, medical benefits, seniority and other conditions of employ-

ment currently covered by Title VII. Pregnancy-based distinctions will be subject to the same scrutiny or the same terms as other acts of sex discrimination proscribed in the existing statute." H.R.Rep.No.95–948, 95th Cong., 2d Sess. 4 (1978), U.S.Code Cong. & Admin.News at 4752. It covers not only fringe benefits but also other employment policies adversely affecting pregnant workers, including termination of pregnant women and reinstatement rights. *Id.* at 6. In sum, it "prevent[s] employers from treating pregnancy, childbirth and related medical conditions in a manner different from their treatment of other disabilities." *Id.* at 5, U.S.Code Cong. & Admin.News at 4753.

**57.** *Nashville Gas Co. v. Satty, supra* note 53, 434 U.S. at 138–143, 98 S.Ct. at 349–352, 54 L.Ed.2d at 361–365. For nearly a decade the Equal Employment Opportunity Commission has fostered a guideline providing that

> [w]ritten or unwritten employment policies and practices involving matters such as the commencement and duration of leave, the availability of extensions, . . . and other benefits and privileges, [and] reinstatement, . . . shall be applied to disability due to pregnancy, childbirth or related medical conditions on the same terms and conditions as they are applied to other disabilities. . . .

29 C.F.R. § 1604.10(b) (1979). This guideline was approved by the *Satty* Court. 434 U.S. at 142 n.4, 98 S.Ct. at 351 n.4, 54 L.Ed.2d at 364 n.4.

**58.** See App. 104–107.

**59.** Appellant's appointment to the position of administrative assistant in the PEP program was limited to the period during which the Department of Labor supplied its financial support. App. 130, 138, 226.

**60.** App. 106.

allowing such employees any amount of additional leave for any purpose.[61] The union endeavors to defend ten days[62] as the unyielding maximum leave entitlement of PEP employees on the ground that the short duration of the project could tolerate no more.[63] This argument clashes violently with the letter as well as the spirit of Title VII.

While a ten-day leave undoubtedly would accommodate a wide range of temporary disabilities, it falls considerably short of the period generally recognized in human experience as the respite needed to bear a child.[64] Thus, while many female as well as male employees could have held a PEP job without any problem at all, any such jobholder confronted by childbirth was doomed to almost certain termination. Oncoming motherhood was virtually tantamount to dismissal, though other indispositions might well and usually would pose no threat to continued employment. In short, the ten-day absolute ceiling on disability leave portended a drastic effect on women employees of childbearing age—an impact no male would ever encounter.[65]

An employer can incur a Title VII violation as much by lack of an adequate leave policy as by unequal application of a policy it does have. Title VII outlaws employment discrimination traceable to an em-

ployee's gender, and it takes little imagination to see that an omission may in particular circumstances be as invidious as positive action. As the Equal Employment Opportunity Commission has declared,

> [w]here the termination of an employee who is temporarily disabled is caused by an employment policy under which insufficient or no leave is available, such a termination violates the Act if it has a disparate impact on employment of one sex and is not justified by business necessity.[66]

Beyond peradventure, the limitation of leave to ten days affected women employed in the PEP program much more severely than any male engaged therein, or elsewhere in the union's hire.[67] It therefore cannot afford the union refuge unless demonstrably it was required by the exigencies of the project, a matter to which we now turn.

### IV

Among the grounds the union assigned for appellant's termination was uncertainty surrounding the date on which appellant planned to return to work,[68] and there was evidence suggesting that at times appellant was ambivalent in that regard. In late

---

**61.** App. 107; Brief for Appellee at 24.

**62.** It seems that PEP employees could combine the separate ten-day sick and vacation leave periods to provide twenty days for purposes of maternity. App. 107. This would mean, however, that temporary employees doing so would have to forego vacations, which permanent employees could take as a matter of course. Whatever might be said in justification for a difference in vacation leaves for permanent and temporary employees, maternity leave is something else again; temporary female employees need as much maternity leave as their counterparts in permanent positions, and even twenty-day maternity leaves for the temporary group would leave them short.

**63.** Brief for Appellee at 24.

**64.** Testimony before the House Committee on Education and Labor on the bill adding 42 U.S.C. § 2000e(k), see note 56 *supra*, indicated that the normal period of pregnancy leave is about six weeks. H.R.Rep.No.95–948, 95th

Cong., 2d Sess. 5. Medical complications—expectable in about 5% of the cases—would of course prolong the period. *Id.*

**65.** See *Nashville Gas Co. v. Satty, supra* note 53, 434 U.S. at 142, 98 S.Ct. at 351, 54 L.Ed.2d at 364.

**66.** 29 C.F.R. § 1604.10(c) (1979). This guideline was in effect at the time appellant took maternity leave. 29 C.F.R. § 1604.10(c) (1977). The Office of Federal Contract Compliance Programs has formulated a similar provision. See 41 C.F.R. § 60–20.3(g)(2) (1980).

**67.** Compare *Nashville Gas Co. v. Satty, supra* note 53, 434 U.S. at 142, 98 S.Ct. at 351, 54 L.Ed.2d at 364.

**68.** See *Abraham v. Graphic Arts Int'l Union* (memorandum), *supra* note 20, at 2–8, App. 3–9.

June or early July, 1977, according to her then superior, appellant responded to inquiries concerning her plans by stating that she was not certain that she would return at all, and that if she did it would not be before the following January.[69] Another employee reported a similar statement by appellant on or about her last day of work in early August.[70] The District Court held that these declarations, particularly in view of the short term of the PEP program,[71] gave the union adequate reason to secure a replacement.[72]

The insurmountable difficulty, however, is that the evidence on that point was not free from dispute. There were events indicating that appellant fully intended to return to her job if the PEP program were renewed,[73] and that she worked out the amount of leave time as best she could. There was evidence that appellant had endeavored to find out her entitlement to maternity leave, and that through no fault of her own was unable to do so.[74] This evidence is susceptible to the interpretation that, left largely to shift for herself, she had in mind a period well in line with union policy and actual practice in regard to other employees.[75] Only after further exploration at a factfinding session can it be determined whether the union should be sustained on this aspect of its defense.

We find, then, that the union has not demonstrated either its right to judgment "with such clarity as to leave no room for controversy,"[76] or that appellant "would not be entitled to [prevail] under any discernible circumstances."[77] The judgment appealed from is accordingly reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*

---

**69.** App. 127, 129, 226.

**70.** App. 230.

**71.** The original contract funding the project set the term from July 1, 1975, through August 31, 1976. App. 225. Two extensions projected the terminal date to August 31, 1977. App. 226. The second contract covered the period from September 1, 1977, through August 31, 1978. App. 226.

**72.** *Abraham v. Graphic Arts Int'l Union (memorandum), supra* note 16, at 8, App. 9.

**73.** App. 249. When appellant commenced her leave on August 5, 1977, it was uncertain as to whether the PEP project would continue beyond August 31, its then terminal date. App. 249. Appellant says Beryl Brown told her that a temporary replacement would be hired. App. 249. Appellant also states that two weeks after she left Beryl Brown inquired about her return, and that appellant thereupon advised that she would make that known as soon as the baby arrived. App. 249. Appellant adds that on the day after her child was born, she endeavored unsuccessfully to reach Beryl Brown by telephone to inform her thereof. App. 249. Any further effort in that regard would have been futile because notice of her termination was already on the way. App. 249, 251.

**74.** App. 249.

**75.** Four full-time permanent employees had been granted maternity leave, one for a total of nine months. App. 104, 224. A male official was granted a nine-month leave for illness. App. 106.

**76.** *Nyhus v. Travel Management Corp., supra* note 23, 151 U.S.App.D.C. at 271, 466 F.2d at 442, quoting *Semaan v. Mumford,* 118 U.S.App. D.C. 282, 283 n.2, 335 F.2d 704, 705 n.2 (1964), in turn quoting *Traylor v. Black, Sivalls & Bryson, Inc.,* 189 F.2d 213, 216 (8th Cir. 1951).

**77.** *Nyhus v. Travel Management Corp., supra* note 23, 151 U.S.App.D.C. at 271, 466 F.2d at 442, quoting *Semaan v. Mumford, supra* note 76, 151 U.S.App.D.C. at 271, 466 F.2d at 442, in turn quoting *Traylor v. Black, Sivalls & Bryson, Inc., supra* note 76, 189 F.2d at 216.