**Ilya V. TALEV, et al., Appellants,**

v.

**John E. REINHARDT, et al.**

**No. 79–1132.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 1980.
Decided Aug. 31, 1981.

Alexander G. Park, Bethesda, Md., for appellants.

Alfred Mollin, Atty., Dept. of Justice, Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, and Robert Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee. Susan M. Chalker and Leonard Schaitman, Attys., Dept. of Justice, Washington, D. C., also entered appearances for appellee.

Before ROBINSON, Chief Judge, MIKVA, Circuit Judge, and JUNE L. GREEN,* District Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

This appeal features a claim that the Voice of America (VOA), the broadcasting arm of the International Communication Agency,[1] discriminates against an employee because of his national origin. Perceiving no issue of fact material to the litigation, the District Court held that the evidence proffered by the employee did not make out a prima facie case, and entered summary judgment for VOA.[2] We conclude that even if a prima facie case was established, it was effectively rebutted by an uncontested evidentiary tender by appellees[3] demon-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The International Communication Agency is the successor to the United States Information Agency, the parent agency of VOA when suit was filed.

2. *Talev v. Reinhardt*, Civ. No. 76–1301 (D.D.C. Dec. 13, 1978) (order).

3. The appellees are John E. Reinhardt, Director of the International Communication Agency, and Kenneth R. Giddens, Assistant Director of VOA. Originally named as defendants were Giddens and James Keogh, Reinhardt's prede-

strating that the differentials protested are job-related, and thus no predicate for litigation.

## I. BACKGROUND

Title VII of the Civil Rights Act of 1964,[4] as extended by the Equal Employment Opportunity Act of 1972,[5] prohibits federal employment practices having the purpose or effect of discriminating on the basis of race, color, religion, sex or national origin.[6] In 1974, Ilya V. Talev, a Bulgarian-born American citizen, was hired by the Bulgarian Section of VOA's European Division[7] to prepare and broadcast radio programs in his native tongue.[8] Talev initially had indicated that he was amenable to a foreign service position[9] at the grade equivalent of GS–7, and a minimum salary of $12,000.[10] Eventually, however, he was offered, and accepted, employment at a grade equal to GS–9 and salaried at $13,193.[11] Nevertheless, Talev quickly grew dissatisfied with his grade level and remuneration.[12] After unsuccessfully seeking gratification administratively,[13] he sued in District Court on behalf of himself and others purportedly similarly situated,[14] alleging discrimination

cessor. In due course, pursuant to Fed.R.Civ.P. 25(d), the District Court substituted Reinhardt for Keogh. *Id.* (Jan. 19, 1978) (order).

4. Pub.L.No.88–352, tit. VII, 78 Stat. 253 (1964), as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976) [hereinafter cited as codified].

5. Pub.L.No.92–261, 86 Stat. 103 (1972), codified, as amended, variously at 42 U.S.C. §§ 2000e to 2000e–17 (1976) [hereinafter cited as codified].

6. 42 U.S.C. § 2000e–16 (1976).

7. VOA has seven language divisions: Worldwide English, European, Latin American, U.S. S.R., African, East Asian and Pacific, and Near Eastern and South Asian. The European Division, which broadcasts primarily to Eastern Europe, has 13 separate language services, including the Bulgarian Service to which Talev is assigned. See VOA Organizational Chart, Certified Index to Record (C.I.R.) Doc. 36 (Exhibit (Ex.) F).

8. Transcript of Administrative Hearing, vol. 3, at 16, C.I.R. Doc. 36 (Ex. A–3) [hereinafter cited as Tr.].

9. For a decade, all VOA personnel have been within the foreign service personnel system, now set forth in the Foreign Service Act of 1980, Pub.L.No.96–465, 94 Stat. 2071 (1980), 22 U.S.C.A. §§ 3901 *et seq.* (West Supp.1981). The 1980 Act supersedes the Foreign Service Act of 1946, Pub.L.No.79–724, 60 Stat. 999 (1946), as amended, 22 U.S.C. §§ 801 *et seq.* (1976), which was in vogue when Talev came to VOA in 1974. See *American Fed'n of Gov't Employees v. Rogers*, Civ. No. 71–3141 (D.D.C. June 12, 1973) at 3 n.2 (memorandum opinion). We need not concern ourselves with differences between the 1946 and 1980 statutory schemes. Talev grounds his complaint exclusively on Title VII and the Fifth Amendment, see note 65 *infra*, and in any event the 1980 Act provides that "[a]ny grievances, claims, or ap-

peals which were filed or made under [authority of the Foreign Service Act of 1946] and are pending resolution on the effective date of this Act shall continue to be governed by the provisions repealed, modified, or affected by this Act." 22 U.S.C.A. § 4172 (West Supp.1981). References herein will be made, then, to the repealed rather than the current legislation.

10. United States Information Agency, Report of Investigation, Equal Employment Opportunity Complaint of Ilya V. Talev, C.I.R. Doc. 36 (Ex. A–1, 37) [hereinafter cited as EEO Report].

11. Tr., vol. 1, at 27; EEO Report, *supra* note 10, at 34.

12. EEO Report, *supra* note 10, at 130. Talev said that his initial decision to accept a $12,000 salary was based on false information; that the grade he eventually received was that of secretaries, not persons of his education and teaching experience; and that personnel editing his work were reducing the language he used "to the substandard level of their own." *Id.* at 132.

13. Talev's administrative complaint originally alleged discrimination both on religious and national-origin grounds, but subsequently was amended to omit the charge of religious bias. See *id.* at 2. Following an investigation and a hearing before an equal employment opportunity complaints examiner, see Findings and Recommended Decision in the Discrimination Complaint of Ilya v. Talev, C.I.R. Doc. 36 (Ex. A–4) [hereinafter cited as Administrative Decision], the Civil Service Commission concluded that the record failed to support Talev's discrimination claim. *Id.* at 5.

14. Talev's motion for class certification subsequently was denied by the District Court. See text *infra* at note 19.

on account of national origin.[15]

In essence, Talev's complaint charged that employees in VOA's Worldwide English Division,[16] who primarily are American-born, are given preferential treatment in comparison with employees in VOA's European Division, who largely are foreign-born.[17] In an attempted support of this claim, Talev pointed to various facially neutral VOA employment policies and practices assertedly operating to the disadvantage of foreign-born employees.[18] Talev lost on a bid for class certification,[19] but prevailed substantially on his motion to compel discovery of statistical data on VOA employees.[20] With these data,[21] Talev proffered extensive statistical evidence,[22] and both sides moved for summary judgment. The District Court, concluding that Talev had not met his burden of establishing a prima facie case of employment discrimination, entered judgment in favor of appellees,[23] and *sua sponte* taxed costs against Talev.[24]

In the main, Talev assails the District Court's ruling that his evidentiary tender did not make out a prima facie case.[25] In addition, he asserts that the court erred in denying his motion for class certification,[26] in restricting discovery,[27] and in assessing costs against him.[28] Appellees, in turn, argue that Talev did not present sufficient evidence to generate a claim under Title VII or, if he did, that higher grades and salaries existent in the Worldwide English Division are explained by heavier responsibilities shouldered by employees therein, as well as by superior qualifications they bring to their tasks.[29] Appellees resist all of Talev's other contentions except the last, which they say is moot in light of their decision not to seek costs.[30] In view of that position, we vacate the award of costs, and proceed to consider the remainder of Talev's challenges.

## II. THE GOVERNING PRINCIPLES

■ The shifting burdens of proof in Title VII "disparate impact" litigation[31] are well entrenched. The complainant has the initial burden of constructing a prima facie

---

**15.** Complaint ¶ 2, Appendix (App.) 6–36. Also named as plaintiffs in the action were three others. Because none of them had been parties to the administrative proceedings, the District Court dismissed two, U Kyaw Aye and U Kyin Oo. *Talev v. Keogh*, No. 76–1301 (D.D.C. Nov. 11, 1976) (order). The court later dismissed the third, Josephina Martinez, on the ground that she stated only a claim of sex discrimination. *Id.* (Feb. 15, 1977) (order).

**16.** See note 7 *supra.*

**17.** Fluency in the language utilized in a VOA division's broadcast is a condition to employment as a broadcaster therein. It thus is not surprising that foreign-language broadcasters likely are natives of the countries to which they broadcast, and that most Worldwide English broadcasters are native-born Americans. Tr., vol. 4, at 37.

**18.** See Complaint ¶¶ 15(b), (e), (f), (g), (i), App. 26–29.

**19.** *Talev v. Keogh, supra* note 15, (Nov. 11, 1976), (order), App. 89.

**20.** *Id.* (Apr. 20, 1977) (order), App. 128. A protective provision barred discovery of information revealing the race or sex of VOA employees or the identities of those foreign-born. *Id.*

**21.** Talev apparently used the data to supplement a statistical presentation he had made at the administrative level. See Administrative Decision, *supra* note 13, App. 260.

**22.** See Statement of Points and Authorities in Opposition to Defendant's (*sic*) Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment 7–10, App. 170–173.

**23.** *Talev v. Reinhardt, supra* note 2, (Dec. 13, 1978) (order), App. 253.

**24.** *Id.*

**25.** Brief for Appellant at 44–56.

**26.** *Id.* at 26–44.

**27.** *Id.* at 56–60.

**28.** *Id.* at 60–62.

**29.** Brief for Appellees at 29–48.

**30.** *Id.* at 53 n.28.

**31.** See *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971).

case by showing that facially neutral employment standards operate in a proscribed discriminatory fashion.[32] The burden then falls upon the employer to demonstrate that these standards have "a manifest relationship to the employment in question."[33] The complainant may then show that other policies or practices would "serve the employer's legitimate interest in 'efficient and trustworthy workmanship'" without a discriminatory impact.[34]

This analytical approach is to be taken whether the adjudicative context is summary judgment or trial.[35] But since summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law,"[36] the court must ascertain at each successive stage[37] whether any fact essential to the claim or defense is disputed and, if not, whether on the basis of the proffered evidence a summary disposition is legally demandable.[38] Our task on this appeal is to ascertain whether the District Court was obedient to these tenets.

## III. TALEV'S SHOWING

Talev asserts that he presented a prima facie case of national-origin discrimination when he submitted statistical evidence disclosing that employees in VOA's Worldwide English Division fare better in terms of grade, salary and promotion than employees in the European Division. This contention rests on a combination of several items.[39] More journeyman positions were authorized for the Worldwide English Division than for the European Division.[40] European Division employees were primarily foreign-born, and Worldwide English Division employees mainly were American-born.[41] Foreign-born employees had lower personal grades and salaries on the average than American-born employees.[42] More foreign-born than American-born employees had personal grades below the grade of the posi-

32. *E. g., Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–2727, 53 L.Ed.2d 786, 797 (1977); *Griggs v. .Duke Power Co., supra* note 31, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165. See also *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 575–576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 966 (1978) (disparate treatment); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973) (same).

33. *Dothard v. Rawlinson, supra* note 32, 433 U.S. at 329, 97 S.Ct. at 2726–2727, 53 L.Ed.2d at 797; *Griggs v. Duke Power Co., supra* note 31, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165. See also *McDonnell Douglas Corp. v. Green, supra* note 32, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

34. *Dothard v. Rawlinson, supra* note 32, 433 U.S. at 329, 97 S.Ct. at 2726–2727, 53 L.Ed.2d at 979, quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280, 301 (1975), in turn quoting *McDonnell Douglas Corp. v. Green, supra* note 32, 411 U.S. at 801, 93 S.Ct. at 1823, 36 L.Ed.2d at 677. Rebuttal in a disparate impact case by a showing of alternative nondiscriminatory practices is equivalent to demonstration in a disparate-treatment case that the employer's purported explanation is merely a pretext, and thus not actually a justification for the discrimination charged. Compare *McDonnell Douglas Corp. v. Green, supra* note 32, 411 U.S. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679.

35. See the discussion in *Abraham v. Graphic Arts Int'l Union,* 212 U.S.App.D.C. 412, 415, 416 & n.29, 660 F.2d 811, 814–815 & n.29 (1981).

36. Fed.R.Civ.P. 56(c).

37. See text *supra* at notes 32–34.

38. See *Abraham v. Graphic Arts Int'l Union, supra* note 35, 212 U.S.App.D.C. at 416 & n.29, 660 F.2d at 814–815 & n.29.

39. These data reflect conditions at VOA as of March, 1975. Brief for Appellant at 49.

40. *Id.*

41. The Worldwide English Division had five times the number of positions above the journeyman level, and almost three times the number of employees in grades above the journeyman level, existing in the European Division; more than twice as many employees in the European Division had grades below the journeyman level. *Id.* at 54.

42. Specifically, Talev's statistics revealed that the average grade of employees in the European Division was .8 lower than that for employees in the Worldwide English Division, and that the average salary of European Division employees was $4,123 lower than that of Worldwide English Division employees. *Id.* at 54.

tion to which they were assigned, and more American-born than foreign-born employees had personal grades above the grade of their assigned position.[43] More American-born than foreign-born employees had personal grades established on the basis of their grasp of American foreign policy and of the cultural situation in one or more foreign countries, rather than on the basis of their journalistic training and experience.[44]

Talev appears to attribute these disparities mainly to four alleged practices at VOA:[45] (1) appointing employees to positions without regard to their personal grades;[46] (2) maintaining separate promotional categories for English-language and foreign-language broadcasters;[47] (3) setting the grades of new employees on the basis of positions available rather than the employees' qualifications;[48] and (4) hiring at junior levels and promoting from within.[49]

We need not ponder the question whether the District Court was correct in its holding that this evidentiary tender was insufficient to attest a prima facie case of employment discrimination under Title VII.[50] VOA offered evidence tending strongly to show

that all of the variances to which Talev points are the result of substantial differences in the qualifications and job responsibilities of employees in the two divisions.[51] Not only was VOA's submission overwhelming, but it also was undisputed by countervailing evidence. That sealed Talev's fate on the cross-motions for summary judgment.[52]

## IV.  APPELLEES' SHOWING

### A.  *The General Rebuttal*

■ The Worldwide English Division, as its title implies, broadcasts to countries around the globe.[53] It does so for many more hours each day than foreign-language programs of the European Division are aired.[54] Moreover, the Worldwide English staff must be able to perform a variety of tasks not required of foreign-language broadcasters, among which are the development of original broadcast material including features, roundtable discussions and documentaries.[55] Worldwide English employees must also be able to function day-to-day as correspondents on special assignments throughout the Nation and the world.[56] On the other hand, broadcasters in

**43.** Twice as many Worldwide English broadcasters had grades higher than those of the positions to which they were assigned; twice as many foreign-language broadcasters had grades below those of their assigned positions. *Id.* at 52.

**44.** Twice as many Worldwide English broadcasters were filling such positions. *Id.* at 49.

**45.** Despite Talev's apparent attempt to show a causal relationship between the four employment practices complained of and the four discriminatory effects alleged, no precise conclusion emerges. See Part IV *infra.*

**46.** Brief for Appellant at 51–53.

**47.** *Id.* at 53–56.

**48.** *Id.* at 47–49.

**49.** *Id.* at 49–50.

**50.** Appellees argue that Talev actually complains of discrimination on the basis of alienage rather than national origin, and for that reason he thus fails to state a claim under Title VII. Brief for Appellees at 44–47. We do not reach

this contention, for we find that even if Talev established a prima facie case, appellees effectively rebutted it. See Parts IV and V *infra.*

**51.** That evidence is summarized in Part IV *infra.*

**52.** See text *supra* at notes 32–34.

**53.** Tr., vol. 2, at 99.

**54.** Worldwide English Division broadcasts extend over more than 22 hours each day. See Tr., vol. 4, at 4. None of the language services in the European Division exceed 17.5 hours of broadcast time per week; the Bulgarian Service broadcasts only 10.5 hours weekly, an average of only 1.5 hours per day. Tr., vol. 2, at 101; Brief for Appellees at 16.

**55.** Tr., vol. 2, at 100–102.

**56.** Tr., vol. 4, at 16. The Worldwide English Division thus operates much like our nation-wide commercial radio networks, providing comparable coverage of such major news events as space flights, elections and national conventions. Tr., vol. 4, at 18.

the European Division, limited as they are by the amount of air time available,[57] usually present relatively brief news programs.[58] Even when time permits, they generally broadcast only translated adaptations of material developed by the Worldwide English Division.[59] Resultantly, employees in the European Division are called upon to handle far fewer and less demanding assignments than those in the Worldwide English Division.

Employees in the two divisions also vary substantially in the qualifications they bring to the job. Professional broadcasters and graduates of journalism schools provide a diverse and talented pool from which Worldwide English broadcasters are hired,[60] but practical and political realities severely curtail VOA's ability to lure equally qualified foreign-language broadcasters. Not only are there few foreign-language radio stations in the United States from which experienced foreign-language broadcasters can be sought,[61] but also most professional broadcasters in Eastern European countries are unavailable for VOA recruitment.[62] As a consequence, foreign-language broadcasters at VOA normally have had substantially less professional journalistic experience than VOA's Worldwide English broadcasters.[63]

Comparisons of grades, salaries and promotional opportunities within the two divisions that do not take these differences in qualifications and responsibilities into account are plainly incapable of carrying the day for Talev, absent additional evidence that other means are available to insure satisfaction of VOA's legitimate interest in "efficient and trustworthy workmanship" without occasioning such differentials.[64] Talev's failure to proffer such evidence compels the conclusion that appellees have met their burden of demonstrating that even if the variances complained of sufficed to make out a prima facie case of national-origin employment discrimination, they were job-related and thus not violative of Title VII.

### B. The Challenged Practices

In supplementation of their general rebuttal, appellees proffered further evidence—likewise uncontested—portending a showing that the practices which Talev assails either are justified by business necessity or were not a cause of any of the differentials at issue. We consider, in turn, each of Talev's contentions in light of this evidentiary material.

### 1. Appointment Without Regard to Personal Grade

Talev argues that VOA's facially neutral policy of appointing employees to positions without regard to their personal grades ac-

57. Tr., vol. 2, at 102–104. See note 54 supra.

58. See Tr., vol. 2, at 102.

59. Tr., vol. 2, at 102; vol. 4, at 14–15.

60. Tr., vol. 1, at 32; vol. 2, at 94. Many applicants for broadcast positions in the Worldwide English Division have 20 or more years of professional broadcasting experience. Tr., vol. 4, at 12. Five or six years of hard experience is considered a minimum qualification. Tr., vol. 4, at 11–12.

61. See Tr., vol. 2, at 95–96.

62. One VOA official explained the situation this way:

> For some languages VOA can hire directly from overseas. We will hire people who are broadcasters in their own country who have experience. But where we are talking about Eastern Europe and the Soviet Union, there is no way we can hire directly. Say from Bulgaria, there is no way the Bulgarian government is going to allow someone out to broadcast for VOA. And obviously, if they were going to let somebody out directly, we would be very leary of security problems.

Tr., vol. 2, at 96.

63. Tr., vol. 2, at 96. The European Division does, however, employ several highly qualified broadcasters whose professional experience is comparable to that of the most experienced Worldwide English Division broadcasters. See Tr., vol. 4, at 32–33.

64. Talev's statistical expert conceded as much, acknowledging that the lack of parity in training and duties between employees in the two groups might well explain the disparities of which Talev complains. Tr., vol. 2, at 17–18, 20.

cords those in the Worldwide English Division greater compensation than those in the European Division doing the same work.[65] This so-called "rank in person" system—which statutorily governs the appointment and assignment of all Foreign Service employees, and thus those at VOA [66]—permits the agency to assign and transfer employees from post to post as its organizational interests may require.[67] The rank in person system differs from the "rank in position" system of the civil service, under which the employee and his position are assigned the same grade.[68] Under the rank in person system, grades are assigned to positions and employees separately, with the grade of the position assessed at its maximum performance level, and the grade of the employee established on the basis of his or her personal qualifications.[69] The result is that Foreign Service employees frequently occupy positions having higher grades than their personal grades.[70] Similarly, it often happens that two employees having substantially different qualifications or experience may be assigned to positions bearing the same rank.[71] That they receive incommensurate salaries, though assigned to positions of equivalent grades, is amply explained by the differences in qualifications and responsibilities of employees in the two divisions.[72]

### 2. *Promotional Disparities*

Talev next urges that VOA's maintenance of separate promotional categories for English-language and foreign-language broadcasters renders the advancement opportunities for foreign-born employees inferior.[73] He insists that the sole distinction underlying these groupings is national origin,[74] and cites the greater number of journeyman positions and journeyman-level employees in the Worldwide English Division than in the European Division as proof of discriminatory effect.[75]

This contention, too, however, founders when examined in light of appellees' proffered evidence. First, as we have said, variation in number of journeyman employees and authorized journeyman positions is adequately explained by both the "rank in person" system [76] and the differences in professional training of, and types of work performed by, employees in the two divisions.[77] Additionally, while as a general rule VOA separates the two divisions for purposes of employee advancement,[78] it avowedly does so to enable foreign-language broadcasters to vie for available positions in the European Division without having to compete with the generally more journalistically experienced English-lan-

---

**65.** Talev asserts that this practice additionally violates the equal-pay provisions of the Federal Pay Comparability Act of 1970, Pub.L.No.89–554, 80 Stat. 458 (1966), as amended, 5 U.S.C. § 5301 (1976 & Supp. IV). We do not consider this claim, for his presentation to the District Court was grounded exclusively on Title VII and the Fifth Amendment. Complaint ¶¶ 1, 3, App. 6–8. See, *e. g., Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967). Although Talev did advert to the Pay Comparability Act in his complaint, see Complaint ¶ 15, App. 24, we do not read this reference as a separate claim for relief.

**66.** See note 9 *supra*.

**67.** 22 U.S.C. § 923 (1976) (repealed 1980). See note 9 *supra*. We note that the rank in person system is retained in § 923's successor provision. See 22 U.S.C.A. § 3982 (West Supp. 1981).

**68.** Tr., vol. 3, at 85–88.

**69.** Tr., vol. 3, at 85–88.

**70.** Tr., vol. 3, at 86. Assignments to positions with higher grades apparently are much sought after, for successful performance in these positions can enhance an employee's chances for promotion. See Brief for Appellees at 7.

**71.** See Tr., vol. 3, at 86.

**72.** See text *supra* at notes 53–64.

**73.** Brief for Appellant at 53–56.

**74.** *Id.* at 53.

**75.** *Id.* at 54.

**76.** See text *supra* at note 69.

**77.** See text *supra* at notes 53–64.

**78.** Tr., vol. 3, at 96.

guage broadcasters.[79] And, while language barriers make transfers from one division to the other difficult,[80] such transfers do occur, and more frequently from the European Division to the Worldwide English Division than vice versa.[81]

### 3. *Grade Establishment*

Talev's last contention is that VOA sets the grade of new employees in terms of the position available, rather than on the basis of the employee's age, qualifications and experience as required by the Foreign Service Act,[82] and that this practice operates to discriminate against foreign-born employees.[83] In support of this claim, Talev submitted statistical evidence showing that while half of the English-language broadcasters were graded congruently with positions requiring knowledge of economic, cultural and political conditions in foreign areas, less than 20 percent of the foreign-language broadcasters were so treated. Grading of foreign-language broadcasters, Talev urges, emphasizes qualifications and characteristics more common among American-born than foreign-born applicants, with the result that the latter suffer in the process.[84] To fully grasp Talev's thesis, we must review briefly the job-classification and the

employee-qualification policies in operation at VOA at the time he was hired.

Prior to 1971, the post for which Talev was engaged—that of Writer (Radio)—was considered a civil service job, and thus was ranked according to civil service classification standards.[85] The criteria applicable to Talev's job were those of the GS–1082 occupational classification series, which governed writing and editing appointments generally.[86] These standards were drawn broadly and referred to *positions*, not the qualifications of employees filling them.[87] Under the civil service system, applicants for vacant positions were selected for their ability to perform the duties thereof, a determination abiding by the civil service employee qualification standards applicable to GS–1082 jobs.[88] Because those jobs were classified as writing and editing functions, the pertinent standards stressed journalistic training at the expense of academic credentials.[89]

In 1971, all VOA positions came within the purview of the Foreign Service personnel system set forth in the Foreign Service Act.[90] Consequently, when in 1974 Talev came aboard, his entrance grade had to be set in accordance with his "age, qualifica-

---

**79.** Talev himself is a good example of this. By the time he brought this litigation, he already had received two promotions in the Bulgarian Section even though his broadcasting qualifications were measurably lower than those of most Worldwide English Division broadcasters. See Tr., vol. 3, at 96–97; Brief for Appellees at 13.

**80.** Tr., vol. 1, at 80–81; vol. 2, at 58.

**81.** Tr., vol. 4, at 31–32.

**82.** 22 U.S.C. § 923 (1976) (repealed 1980). See note 9 *supra*.

**83.** Brief for Appellant at 47–49.

**84.** See *id.* at 49; text *infra* at notes 85–96, and note 94 *infra*.

**85.** Tr., vol. 2, at 87–88.

**86.** Positions in the GS–1082 occupational classification series are described as follows:
This series includes positions that involve as their primary function, writing, rewriting or editing reports, articles, news stories and

releases which are to appear in publications, reports, periodicals, or the press; or speeches that are to be presented in person, or by means of radio or television, or radio, television, or motion picture scripts. This kind of writing and editing requires the ability to acquire information about different subjects and to analyze, select, and present the information in a form suitable for the intended audience. It does not require substantial subject matter knowledge.
Handbook of Groups and Series of Classes, Writing and Editing Series, GS–1082, C.I.R. Doc. 40 (Ex. M).

**87.** *Id.*

**88.** Tr., vol. 2, at 61–70; Qualifications Standards: Writing and Editing Series, GS–1082, C.I.R. Doc. 40 (Ex. K).

**89.** See note 86 *supra*.

**90.** See note 9 *supra*.

tions and experience." [91] The changeover, however, from the civil service to the foreign service system was still fairly recent, and no foreign service employee-qualification standards for Talev's post had been established.[92] VOA therefore relied upon the old civil service employee-qualification standards in establishing Talev's grade, and weighed his relative lack of journalistic experience more heavily than his relatively extensive academic training.[93]

Talev complains that this methodology was inappropriate, and that VOA should have fixed his grade by reference to standards applicable to the GS–1085, rather than the GS–1082, occupational classification series,[94] which arguably would have placed more emphasis on his academic background. But there never were any civil service employee-qualification standards for the GS–1085 series [95] and, moreover, the GS–1085 job-classification series was reserved for policymaking and supervisory positions above the journeyman level.[96] Talev thus not only confuses job-classification standards with employee-qualification standards, but also insists that his grade should

have been fixed by resort to nonexistent standards for a position he never held. The evidence he relies upon [97] shows nothing more than that a larger number of policy-making and supervisory positions are authorized for the Worldwide English Division than for the European Division, a fact we already have accepted as job-related.[98]

## V. CONCLUSION

Talev's statistical tender, if unexplained, may have sufficed to raise an inference—as the greater likelihood—that the VOA policies complained of affect foreign-born broadcasters more harshly than American-born broadcasters, and do so on account of national origin.[99] But VOA's uncontested proffer of proof revealed that its practices are designed to serve its governmental mission, or that they did not contribute to the results Talev challenges. Talev did not come forward with any evidence indicating that those effects could be avoided by adoption of alternative methods that would meet VOA's operational requirements.

**91.** See note 82 *supra.*

**92.** Tr., vol. 2, at 88. Just why this was so is unclear from the record.

**93.** Tr., vol. 2, at 88.

**94.** Positions in the GS–1085 classification series are described as follows:

This series includes positions the duties of which are (1) to advise on, administer, supervise, or perform research and operational work in the formulation, direction, management, and evaluation of information programs to foreign audiences or (2) to plan, supervise, or perform information work related to the creation, preparation, and dissemination of printed, aural, visual, and audiovisual materials to foreign audiences. Positions in this series require a knowledge of the economic, social, cultural, and political conditions of the foreign area of assignment, of the foreign policy objectives of the United States with respect to the particular area of assignment, and the ability to present information by means of one or more of the mass communications media that will further these objectives.

Handbook of Groups and Series of Classes, Foreign Information Series, GS–1085, C.I.R. Doc. 40 (Ex. M).

**95.** Tr., vol. 2, at 119. The qualification standards VOA used for the GS–1085 occupational classification series were borrowed from other sources, including "the supervisor grade evaluation guide, chap. 51 of Title 51 of Title V which deals with classifications in general, . . . [the] public information series, . . . [and] the writing and editing series . . . ." Tr., vol. 2, at 119.

**96.** Tr., vol. 2, at 116–117.

**97.** See text *supra* at note 84.

**98.** See text *supra* at notes 53–64. We put aside Talev's contention that VOA's historical policy of hiring at junior levels and promoting from within exacerbated the effect of VOA's employee-grade assignment system for the simple reason that Talev was not affected by this policy. He was employed at the foreign service equivalent of GS–9, not GS–7. See text *supra* at note 11.

**99.** See, e. g., *Furnco Constr. Corp. v. Waters, supra* note 32, 138 U.S. at 576, 98 S.Ct. at 2949, 57 L.Ed.2d at 966; *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977).

We affirm, then, the District Court's grant of summary judgment in favor of appellees without reaching the issue of class certification.[100]  As earlier stated,[101] however, we vacate the District Court's order taxing costs to Talev.

*So ordered.*

---

**100.**  Talev argues that the protective order barring release of any information revealing identities of foreign-born VOA employees, see text *supra* at note 27, rendered nugatory "the entire process of discovery" because it made it effectively impossible to perform a multiple regression analysis that could determine "whether job responsibilities and status at VOA are attributable to the qualifications of individual employees or are affected by biases against national origin minorities."  Brief for Appellant at 57.  Appellees' chief concern in so limiting discovery was to avoid reprisals against relatives and friends living in the employees' native lands.  This is the type of harm protective orders may appropriately preclude.  See generally 8 C. Wright & A. Miller, Federal Practice §§ 2036–2040 (1970).  Talev neither sought clarification of the answers he received to his interrogatories nor otherwise attempted to remedy his supposed predicament, as by asking for identification of employees by numerical or alphabetical designation rather than by name.  We find no abuse of the broad discretion inherent in discovery regulation.

**101.**  See text *supra* at note 30.