Irene **MOJICA**, Plaintiff–Appellee, Cross–Appellant,

v.

**GANNETT COMPANY, INC.,** Defendant–Appellant, Cross–Appellee.

Nos. 91–3921, 92–1104.

United States Court of Appeals, Seventh Circuit.

March 4, 1993.

Armand L. Andry (argued), Oak Park, IL, for plaintiff-appellee.

Lawrence C. DiNardo (argued), Brenda H. Feis, Pamela J. Griffith, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant-appellant.

Fred Foreman, U.S. Atty., Criminal Div., Chicago, IL, Stuart M. Gerson, Office of U.S. Atty Gen., Jacob M. Lewis, Marleigh D. Dover, Dept. of Justice, Civil Div., Appellate Section, Washington, DC, for amicus curiae U.S.

PER CURIAM.

Pursuant to Circuit Rule 40(f), on February 22, 1993, a majority of the members of this Court voted to hear this matter *en banc,* to decide whether the panel's proposed disposition of the matter conflicts with the holdings of *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (7th Cir.1992), and *Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225 (7th Cir.1992). The date for the oral argument will be set in due course.

CUMMINGS, Circuit Judge, dissenting from the decision to rehear *en banc.*[1]

On February 22, 1993, the Supreme Court decided to consider whether the Civil Rights Act of 1991 is retroactive. *Landgraf v. USI Film Products and Rivers v.*

---

1. Circuit Judge Cudahy joined me in voting to deny the rehearing *en banc.*

*Roadway Express,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649. All circuits to consider this question save the Ninth have decided that Congress did not intend to apply the 1991 Act retroactively to reopen cases tried before the Act. In the absence of such intent, a majority of circuits decided that the Act does not apply to cases tried before its enactment. To my knowledge, however, no circuit has examined the separate question, presented here, of whether Congress intended the 1991 Act to apply to cases tried *after* its enactment. I think the 1991 Act shows beyond doubt that Congress intended it to apply to new trials brought after the passage of the Act. Therefore, I dissent from the decision to hear this case *en banc* on the grounds that *Mozee* and *Luddington* did not determine this question of Congressional intent, since it was not before them. Those cases should not apply to the claims brought in this case, which was tried after the 1991 Act was passed. I drafted the panel opinion that was circulated under Circuit Rule 40(f), and have decided to publish my views in order to better inform the parties about the issues that divide this Court.[2]

Irene Mojica, a female Hispanic–American, works as an overnight disk jockey for WGCI–FM, a radio station owned by Gannett Company that targets an African–American audience in the greater Chicago area. Mojica claims that WGCI promoted less qualified African–American men to prime daytime shifts instead of her, discriminating against her because she is an Hispanic woman. Her case brings before this Court for the first time the question whether and how the Civil Rights Act of 1991[3] may apply to a case tried after its enactment. Mojica argues that our recent opinions in *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (7th Cir.1992), and *Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225 (7th Cir.1992), do not require us to overturn a jury verdict for national origin discrimination in her favor under 42 U.S.C. § 1981 and Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2. I agree. The Act expresses Congress' unambiguous intent to regulate cases tried after the Act's passage. *Mozee* and *Luddington* decided that the Act would not apply retroactively to cases pending on appeal before the Act's passage. Because Mojica's case was tried after the Act was passed, *Mozee* and *Luddington* neither require nor allow this Court to disregard Congress' express intent to apply the 1991 Civil Rights Act to her trial.

I.

Gannett's radio stations divide their broadcasts into "shifts" based on the number and type of listeners attracted at different times of day. Day shifts bring more listeners than night shifts; more listeners generate higher advertising revenues; and so-called "drive-time shifts," when commuters are in their cars, earn the most listeners and the highest revenues of all. For disk jockeys, day shifts, and drive shifts in particular, offer higher profile jobs with higher salaries than night shifts. Mojica has worked for a Gannett-owned radio station since 1979, when she took a job as a part-time announcer on WVON–AM, then the AM counterpart to WGCI–FM. She worked a variety of shifts, including the drive shifts, until 1986, when WVON–AM began broadcasting the same programming offered on WGCI. Mojica then worked for WGCI–FM as a part-time announcer. In January of 1987, WGCI gave her a job as a full-time overnight disk jockey ("DJ"), where she remained until July of 1989. She was relegated to part-time work for five months while the station tried a new overnight DJ, but in December of 1989 Mojica returned to her position as a full-time overnight DJ. Since she began working for WGCI in 1986, Mojica has applied

**2.** Senior District Judge Frank A. Kaufman (D.Md.), sitting by designation, joined in the panel opinion. Since he is not a member of this Court, he could not vote on whether *en banc* consideration was justified. Circuit Judge Manion dissented from the panel opinion and asked that it be circulated to the full Court under Circuit Rule 40(f).

**3.** Pub.L.No. 102–166, 105 Stat. 1071–1100, hereafter referred to as "the Act."

for several non-overnight shifts that offered better salaries, more prestige (and presumably more congenial working hours). Rejected each time, she remains a full-time DJ on the 2:00–6:00 AM shift at WGCI.

Mojica filed suit against Gannett in the Northern District of Illinois on July 6, 1990. She charged Gannett with paying women less than men for comparable work, barred by the Equal Pay Act (29 U.S.C. § 206), sex discrimination barred by Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e), national origin discrimination barred by 42 U.S.C. § 1981 and Title VII, and retaliation against Mojica for complaining about her treatment, barred by § 1981. On November 12, 1991, anticipating the passage of the Civil Rights Act of 1991, Mojica moved to amend her complaint to demand compensatory and punitive damages and a jury trial. The trial judge granted Mojica's motion on November 27, 1991, six days after the Act became law. Save for the jury demand and the alternate damages calculation afforded in one count of her six-count complaint, however, Mojica's amended complaint was identical to her original complaint. The amended complaint pled no new underlying events or theories of recovery. Trial took place before a jury on December 2–5, 1991. The jury found for Gannett on all claims except national origin discrimination; on that claim, Mojica won $35,000 in lost wages and $125,000 in punitive damages. On December 13, 1991, the trial judge partially granted Gannett's motion for judgment notwithstanding the verdict (j.n.o.v.) and overturned the punitive damages award. The court otherwise upheld the jury's verdict, however, and supplemented it with a series of three equitable pay increases of $5,000, to take effect on January 1 and July 1 of 1992, and January 1 of 1993.

Mojica's complaint argued that because she is Hispanic, WGCI promoted other announcers to better shifts and higher salaries who were less popular with listeners and who had less experience on the air. The evidence at trial showed that Mojica applied for six non-overnight shifts after she began working for WGCI–FM, and all

but one were given to black men. She has not received a significant pay raise since 1981; she earns now as then around $30,-000 a year (unless she gains relief in this Court). The two star drive-shift DJs at WGCI earn roughly ten times her salary; studies conducted in 1986 showed that Mojica's popularity ratings were within 10 percent of the second star DJ. All other DJs at WGCI rated equally or less popular than Mojica, yet all earn better salaries. Only the stars have more broadcasting experience than Mojica.

Mojica's testimony about her career at WGCI reveals a constant ambition to improve her performance and advance to a daytime or non-overnight shift. Beginning in the early 1980s, she regularly asked her supervisors what she had to do to advance her position at the station. She testified that in response to these queries, her supervisors gave her a variety of advice, and that she responded, experimenting with her style and her delivery. Her testimony also reveals that she became increasingly frustrated over her failure to advance, and was led to understand from conversations with her supervisors that her opportunities were limited because she was not black. She recalled one conversation in particular, occurring in 1986, where the station manager, Marv Dyson, told her that she had not received an evening shift because she was not a black male, and the station wanted a black male. Her testimony mentions other conversations as well, with Dyson or her supervisors, where she was told or she understood that her opportunities were limited because she was not black. The direct examination, however, did not offer approximate dates for all these conversations. Dyson denied ever making such comments.

Gannett argues as an initial matter that the evidence Mojica offered to prove national origin discrimination could not support the verdict, and that the trial court should have granted Gannett's motion for j.n.o.v. in full. Gannett belittles Mojica's testimony as offering evidence of "a single statement allegedly made to her [by Marv Dyson in the early 1980s] * * * and allegedly repeated by him in 1986" (appellant's

reply brief at 5). Passing over how Dyson's alleged remarks can be characterized as both a "single statement" and "repeated," Gannett offers nothing to rebut Mojica's allegation of several conversations other than Dyson's denials. The jury was entitled to credit Mojica over Dyson. *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 514 (7th Cir.1986). A reasonable jury could find that Dyson's remarks, coupled with the evidence of Mojica's ratings and compensation as compared to other WGCI DJs, were enough to show that WGCI's reasons for promoting non-Hispanic men over Mojica were a pretext for discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Gannett correctly asserts that we review the denial of a j.n.o.v. motion *de novo*. *Aungst v. Westinghouse Electric Corp.*, 937 F.2d 1216, 1219–1220 (7th Cir.1991). But the jury's verdict in this case is supported by substantial evidence, and the trial court properly denied Gannett's j.n.o.v. motion as to compensatory damages. Id.

There remains Mojica's argument that we should reinstate the punitive damage award thrown out by the district judge on Gannett's motion for j.n.o.v. I agree with the trial judge that there was no evidence that Gannett's conduct showed "malice," "evil motive," "reckless" behavior, or "callous indifference." *Yarbrough*, 789 F.2d at 514. The trial judge observed that Mojica had a friendly working relationship with her supervisors, including Marv Dyson. Intentional discrimination is not per se malicious, and the Act requires evidence of malice to support an award of punitive damages. Section 102(b)(1). Because there was no evidence of malice in this case, I would not reinstate the jury's punitive damage award.

**4.** See also *Gersman v. Group Health Ass'n, Inc.*, 975 F.2d 886 (D.C.Cir.1992); *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992), cert. granted, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649; *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992); *Vogel v. Cincinnati*, 959 F.2d 594 (6th Cir.1992); *Harvis v. Roadway Express, Inc.*, 973 F.2d 490 (6th Cir.1992) cert. denied sub nom. *Rivers v. Roadway Express*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649; *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th

## II.

The second question in this case is whether the trial judge properly allowed Mojica to amend her complaint to ask for new procedures and remedies given to victims of discrimination by the Civil Rights Act of 1991. If correctly applied, the Act allowed Mojica to demand a jury trial and seek compensatory and punitive damages under Title VII and § 1981. If her case had been tried before the passage of the Act, her Title VII claims would not have gone to a jury—thus the Act allowed Mojica to use a different procedure to press her discrimination claims. While discriminatory shift assignments were illegal before and after the passage of the Act, the Act created a tougher remedy by allowing Mojica to claim compensatory and punitive damages under Title VII and § 1981, in addition to equitable remedies such as back pay previously offered by Title VII alone.

The retroactive application of the 1991 Civil Rights Act to previously decided cases has spawned a cottage industry in the Courts of Appeals. Although specific approaches varied from case to case, this Court and most others have held that Congress did not indicate (either in the statute or in legislative history) whether the Act would apply to cases pending on appeal. *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929 (7th Cir.1992); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992).[4] Courts then examined the conflicting presumptions of retroactivity and prospectivity offered in *Bowen v. Georgetown Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("congressional enactments * * * will not be construed to have retroactive effect unless their language requires this result"), and *Bradley v. Richmond*

Cir.1992); *Hicks v. Brown Group, Inc.*, 982 F.2d 295 (8th Cir.1992) (en banc); *Baynes v. AT & T Technologies*, 976 F.2d 1370 (11th Cir.1992). Contra: *Davis v. City and County of San Francisco*, 976 F.2d 1536 (9th Cir.1992) (finding that Congress intended to apply the Act retroactively to pending cases), vacated in part on denial of rehearing, 984 F.2d 345 (9th Cir.1993); *Estate of Reynolds v. Martin*, 985 F.2d 470 (9th Cir.1993) (same).

*School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("a court is to apply the law in effect at the time it renders its decision"). *Mozee* concluded that *Bowen* stated the general rule, while *Bradley* "applies in very limited circumstances * * *." 963 F.2d at 938. Our previous cases thus decided that the Act did not require Courts of Appeals to reopen or re-examine cases tried and decided before the Act. These decisions conflated two different types of retroactivity, however: because the Act did not apply retroactively to *trials* occurring before the Act was passed, we reasoned that the Act might not apply retroactively to *conduct* (i.e. discrimination) occurring before the Act was passed.

We have not been confronted with a case like Mojica's, which was tried after the passage of the Act, and here the Act requires a fresh approach. The Act shows by its own terms that Congress intended to regulate discrimination trials occurring after the Act was passed. For example, Section 3 provides: "The purposes of this Act are * * * [to] provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964 * * *." Section 3 identifies the statute as one that creates guidelines for "adjudication." It leaves no room to wonder when courts should begin to use these guidelines. No matter that the Act's new guidelines may alter substantive outcomes: "where [ ] congressional intent is clear, it governs." *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990); *Gay v. Sullivan,* 966 F.2d 1124, 1127 (7th Cir.1992). Since Congress intended the Act to apply to new trials, judicial presumptions for or against retroactivity are irrelevant when, as here, trial occurs after passage of the Act. By creating a new regime for the adjudication of discrimination cases, Congress expressed its intent to hold parties responsible under judgments concerning conduct that occurred before the passage of the Act.

Previous discussions of this issue seem to assume that the Act must be either purely retroactive or purely prospective. If the Act is purely retroactive, then courts must overturn old verdicts and order new trials under the new standards offered by the Act. If the Act is purely prospective, then courts may only apply it to conduct that occurs after the Act was passed. Neither approach is faithful to Congressional intent. Congress can distinguish between differing degrees of retroactivity, and it has done so in the Act. It has not ordered courts to reopen settled disputes, but it has ordered courts to apply the Act's provisions to new trials regardless of when the conduct at issue occurred. Thus the Act is both prospective, in the sense that it applies to new trials, and retroactive, in the sense that it ignores when the wrongful conduct occurred. The Act creates few new rules against discrimination, focusing instead on outlining new procedures and remedies to use in new trials. This should persuade the honest student of Congressional intent that the Act is not addressed to employer's conduct, but rather to the conduct of federal judges administering trials under previously enacted civil rights laws.

Section 102 sets out a new framework for adjudicating claims of intentional discrimination brought under Title VII.[5] Paragraph (d)(1)(A) defines a "complaining party" as "a person *who may bring* an action or proceeding under title VII," identifying future claims without qualification.[6] Paragraph (a)(1) provides compensatory and punitive damages "[i]n an action brought by a complaining party under [42 U.S.C. § 2000e-5] against a respondent who *engaged* in unlawful intentional discrimination." Paragraph (b)(2) explains that punitive damages will be available only where "the respondent *engaged* in a discriminatory practice with malice * * *." Paragraph (c) allows either party to de-

---

**5.** This Section, though applicable to Title VII cases, is codified at 42 U.S.C. § 1981; it coordinates Title VII remedies with those offered by § 1981.

**6.** Emphasis added in all this paragraph's quotations.

mand a jury without distinguishing as to the timing of underlying claims. Section 102 thus modifies the procedural and remedial regime courts must use in Title VII trials. The use of the simple past and future tenses, unqualified by other language, directs courts to apply the new procedures and remedies to prior conduct that was illegal before the Act and remains illegal now. Section 102 has prospective effect without regard to when the wrongful conduct occurred.

Sections 104 and 105 of the Act also address the adjudication of Title VII claims. Section 104 again defines a complaining party as "a person who may bring an action under [Title VII]," addressing the section to all future claimants without qualification. Section 105 is entitled "Burden of Proof in Disparate Impact Cases," and details at length shifting burdens of demonstration and available employer defenses—without reference to the timing of underlying events. Section 107 provides that a "complaining party" (a future claimant) establishes an "unlawful employment practice" when he or she "demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." This Section establishes simple but-for causation as the element to prove in future Title VII cases, without regard to when discriminatory conduct occurred. Since the conduct was and remains illegal, and since the Act merely updates the administration of old causes of action, the Act would have to qualify this simple language if it wished to exempt employers charged with discrimination after its effective date for conduct occurring before the effective date. In other words, the critical event for purposes of applying the Act's Sections on trial procedures is not the allegedly wrongful conduct, but the date of the trial itself.

Any change in procedure for new trials will produce different substantive results in at least some cases. When such changes

are unambiguously ordered by Congress, however, courts are not free to explore retroactivity issues raised by the new laws. The Judicial Improvements Act of 1990, for example, enlarged federal jurisdiction by giving federal courts supplemental jurisdiction over claims "related" to a "case or controversy" where the court has original jurisdiction. 28 U.S.C. § 1367; Pub.L. No. 101–650 § 310(a), 104 Stat. at 5113–5114. That Act further provided that "section [310] shall apply to civil actions commenced on or after the date of the enactment of this act." § 310(c). Courts have not looked to when the underlying conduct in specific lawsuits took place to determine whether parties will be bound by the dislocating effects of litigating in federal rather than state court, or in one trial rather than two. In *American Pfauter v. Freeman Decorating Co.*, 772 F.Supp. 1071, 1073 (N.D.Ill.1991), for example, the conduct underlying the suit occurred three months before Congress enacted the new supplemental jurisdiction statute. Although the dislocating effects of a statute creating a new category of jurisdiction are greater, the 1991 Civil Rights Act speaks in similar terms. Sections 3 and 105 create "guidelines for the adjudication of disparate impact suits," and Section 402 provides that these guidelines "shall take effect upon [the Act's] enactment." These statements are no more ambiguous than the jurisdictional grant in the Improvements Act.

The language of Sections 102 through 107 would be enough to apply all their provisions prospectively to adjudication of future Title VII claims. But there is more—the Act expresses Congress' unambiguous intent to overrule certain Supreme Court cases that narrowly construed existing civil rights laws. Congress overrules court interpretations of its laws often.[7] For example, in 1976, *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343, held that Title VII did not bar employers from discriminating against

---

**7.** See William N. Eskridge, *Overriding Supreme Court Statutory Interpretation Decisions,* 101 Yale L.J. 335 (1991), for data and analysis of how often and why Congress overrules court

decisions. Footnote four offers a list of Supreme Court cases overruled or modified by the Civil Rights Act of 1991.

pregnant women in the workplace. Congress reacted with the Pregnancy Discrimination Act of 1978.[8] The PDA, as it was called, amended the definitions Section of Title VII to provide that "discrimination on the basis of sex" would include discrimination on the basis of pregnancy or related medical conditions. 42 U.S.C. § 2000e(k). After the PDA, *Gilbert* was no longer good law. The Supreme Court acknowledged this in *Newport News Shipbuilding and Dry Dock Co. v. EEOC:*

> [W]e shall consider whether Congress, by enacting the Pregnancy Discrimination Act, not only overturned the specific holding in *General Electric Co. v. Gilbert,* but also rejected the test of discrimination employed by the Court in that case. We believe it did.

462 U.S. 669, 676, 103 S.Ct. 2622, 2627, 77 L.Ed.2d 89 (1983). Most pertinent to the 1991 Civil Rights Act, *Newport News* recognized that when Congress "overturned" *Gilbert* it rejected its reasoning in future cases. Congress has the power, then, to overrule a court's interpretation of a statute and demand that a decision will have no effect in future cases brought under the statute. *Newport News,* 462 U.S. at 676–682, 103 S.Ct. at 2627–2630. The lack of any reference to *Gilbert* in the PDA shows that Congress need not name a decision to express such an intent; unambiguous disagreement is sufficient. 28 U.S.C. § 2000e(k).

The same situation exists with the Civil Rights Act of 1991. Consider *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which interpreted 42 U.S.C. § 1981 to provide common-law damages only for discrimination in the formation of contracts, and not for firings, demotions, or failures to promote. Congress overruled *Patterson* in Section 101(b) of the Act:

> For purposes of [§ 1981], the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

8. Pub.L.No. 95–555, 92 Stat. at 2076 (1978).

Courts' counter-majoritarian powers are justified in part because when Congress does not like a court's interpretation of a law, it is free to amend the law to clarify its will. It did so in the passage quoted above. Common sense and the Constitution require courts to assume that Congress means what it says. It would be sophistry to suggest that *Patterson* should have lingering effect in new civil rights cases for years to come, when Congress has so emphatically expressed its disapproval of that decision. By overruling *Patterson,* Congress erased it from the books, acting *prospectively* to reconfigure the adjudication of rights under pre-existing substantive laws.

For more evidence of Congress' intent, the Court need look no further than Section 105(a) on burdens of proof in disparate impact suits: "The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of 'alternative employment practice.'" On June 5, 1989, the Supreme Court decided *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733, shifting burdens of proof in disparate impact cases to make discrimination harder to prove. *Wards Cove,* of course, had "retroactive" effect on the parties before it—parties whose conduct occurred under a previous regime, and who litigated relying on different burdens of proof than those required by *Wards Cove.* See *Luddington,* 966 F.2d at 228. Does this mean, then, that the law on June 4 before *Wards Cove* was "the same" as the law on June 5? *Id.* Of course not. What does Congress mean when it says it restores "the law as it existed on June 4?" It means simply that *Wards Cove* is to have no prospective effect in future disparate impact cases. If further evidence were necessary to show Congress' intent to abolish the burden scheme created by *Wards Cove* in future trials, the case is singled out and disapproved by name twice in the "findings" and "purposes" Sections that introduce the Act.

Suppose, in the extreme, that Congress penned the following law: "The Congress is dissatisfied with the framework courts have developed for adjudicating civil rights claims under 42 U.S.C. § 1981 and § 2000e. For these reasons, any person who may bring a claim under either of these laws will do so before the Civil Rights Claims Administration, constituted by the Act which follows." No court would read this hypothetical law to create two classes of claimants, one class (complaining of wrongful acts occurring *after* the Act's enactment) to bring claims to the newly constituted commission, the other relegated to the unsatisfactory framework developed by federal courts. Rather, all new claims would go to the new Civil Rights Claims Administration. Congress has spoken in similar terms at Section 3 of the Civil Rights Act of 1991: "The purposes of this Act are * * * to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Its intent to undo the old regime for adjudicating civil rights claims could not be clearer.

For these reasons, I would hold that after the effective dates of the Act, any decision overruled by Congress in the 1991 Civil Rights Act will have no effect on the adjudication of new civil rights claims. To express the point a different way, by overruling certain Supreme Court cases prospectively as to future lawsuits, Congress expressed its intent to bind parties retroactively to any dislocations in substantive outcomes that might occur under the new procedural and remedial regime. The Supreme Court's cases had their day, and Congress did not express its intent to overturn cases litigated and decided under the old regime. But Congress has created a new regime. It has authored a statute directed primarily if not exclusively at the administration of our civil rights laws by federal judges, and we must heed Congress' obvious intent to apply the Act to new trials.

Our prior decisions in *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929 (7th Cir.1992), and *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992), are not at odds with my views. *Mozee* addressed "the difficult task of deciphering to what extent the Civil Rights Act [was] applicable to [a] case which was pending on appeal during its enactment." 963 F.2d at 931. Since "we [could] not divine from the Act's language whether Congress intended the Act to apply retroactively to pending cases," *id.* at 933, we examined the conflicting presumptions on whether an act of Congress applies retroactively. *Mozee* framed its analysis of Congressional intent around the question whether the Act required an appeals court to order a new trial under the new rules offered by the Act. The Act's silence, coupled with a judicial presumption against retroactivity, meant that the Act did not apply to cases pending on appeal. A contrary result would have required us to find that Congress intended to apply the Act retroactively both to pre-Act *trials,* and to pre-Act *conduct.*[9] In the present case I would conclude that Congress intended to apply the Act prospectively to new trials. Since *Mozee* did not examine Congress' intent as to new cases, it does not give us the authority to overturn a verdict in Mojica's favor.

In *Luddington,* again reviewing the application of the Act to a case pending on appeal, we held that "the new act is applicable only to conduct engaged in after the effective dates * * * in the act, at least if suit had been brought before the effective date." 966 F.2d at 230–231. The reservation after the comma is critical, since Congress intended the act to apply to suits brought after the effective date. *Luddington* poses one potential problem for Mojica: her suit was brought both before and after the effective date of the Act, in the form of a pre-Act complaint and a post-Act amended complaint. However, since the Act is primarily about the trial procedures, burdens, and remedies to use in discrimination cases, *Luddington* does not bar Mojica's

---

**9.** *Mozee* refused to apply the Act on remand because we thought the Title VII claims should be subject to the same laws on remand that applied in the first trial. *Id.* at 940.

post-Act claim for compensatory and punitive damages and a jury trial. Since Mojica's case was tried after the Act was passed, the Act governs her trial on its own terms; Congressional intent requires no less. Congress' intent also promotes efficient and predictable judicial administration of civil rights claims: cases tried after the Act will use the new procedures and remedies; cases tried before the Act will not be retried because Congress did not express an intent to apply the new procedural regime retroactively to previously adjudicated cases.[10]

*Luddington* also stated that "[w]hen [Congress] 'overrules' a Supreme Court decision it is not registering disagreement with what the Court did; it is laying down a new rule of conduct—ordinarily for the future." 966 F.2d at 228. Returning to the Act, however, I note that Sections 2 and 3 provide:

The Congress finds that—

       \*      \*      \*      \*      \*      \*

(2) the decision of the Supreme Court in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 [109 S.Ct. 2115, 104 L.Ed.2d 733] (1989), has weakened the scope and effectiveness of Federal civil rights protections.

       \*      \*      \*      \*      \*      \*

The purposes of this Act are—

       \*      \*      \*      \*      \*      \*

(2) to codify the concepts of "business necessity" and "job related" enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), and in other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 [109 S.Ct. 2115, 104 L.Ed.2d 733] (1989).

       \*      \*      \*      \*      \*      \*

(4) to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes \* \* \*.

Contrary to our dicta in *Luddington*, this seems to "register[ ] disagreement with what the Court did." And where new trials are concerned, the Act does, in *Luddington*'s words, "lay[ ] down a new rule of conduct, \* \* \* for the future" by establishing new burdens of proof, procedures, and remedies to use in *future* civil rights trials. It enacts few new rules of conduct where acts of discrimination are concerned, and none concerning Gannett's treatment of Mojica. Consequently, nothing in *Luddington* furnishes a reason to disapprove of the result I suggest today.

Congress registered similar disagreement with Court decisions in other recent statutes. The Older Workers Benefit Protection Act of 1990 provided that "The Congress finds that, as a result of the decision of the Supreme Court in *Public Employees Retirement System of Ohio v. Betts*, 488 U.S. 907, 109 S.Ct. 256, 102 L.Ed.2d 245 (1988), legislative action is necessary to restore the original congressional intent in passing and amending the Age Discrimination in Employment Act of 1967 \* \* \*." Pub.L.No. 101–433 § 101, 104 Stat. 978 (1990). The Civil Rights Restoration Act of 1987 provided that:

The Congress finds that—

(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and title VI of the Civil Rights Act of 1964; and

(2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered.

Pub.L.No. 100–259 § 2, 102 Stat. 28 (1988). *Lussier v. Dugger*, 904 F.2d 661, 666 (11th Cir.1990), relied in part on this language to infer that Congress intended the Restora-

---

**10.** *Banas v. American Airlines*, 969 F.2d 477, 483 (7th Cir.1992), and *Taylor v. Western and Southern Life Ins. Co.*, 966 F.2d 1188, 1199 (7th Cir. 1992), also involved the application of the 1991

Civil Rights Act to cases tried before the Act's enactment, so that today's decision does not affect our holdings in those cases.

tion Act to reach certain types of pre-enactment conduct.[11]

Even if Congressional intent were ambiguous, application of the 1991 Civil Rights Act to Gannett would be fair, because few of the usual problems raised by retroactive application of new rules are present. *Mozee* expressly left open the possibility that the Act's procedural and remedial provisions might apply to pre-Act conduct. 963 F.2d at 939. We indicated that "[b]ecause society's valuation of a victim's losses understandably changes over time, it does not seem unfair to force litigating parties to comply with the more recent statutory changes with regard to damages." *Id.* In *Luddington,* however, we noted that it might be unfair to subject employers to higher liabilities under the new Act because employers "are entitled to an opportunity to readjust their level of care in light of the new environment created by the change." 966 F.2d at 229. Several aspects of Mojica's case persuade me that it is not unfair to apply procedural and remedial provisions of the Act to Gannett's pre-Act conduct.

First, Mojica had the same set of "causes of action" before and after the 1991 Civil Rights Act. *Harvis,* 973 F.2d at 495 ("the elements of a cause of action under § 1981 are identical to those under Title VII"). Her amended complaint allowed her to claim an alternative basis for quantifying the losses she suffered as a result of Gannett's alleged wrongful discrimination. By offering this alternative calculus, the Act eliminated the formalistic and largely useless distinction between a "common-law damages" formula for quantifying Mojica's losses—available post-Act—and an "equitable restitution" formula, available pre-Act. The losses were recognized as losses before and after the Act. In any given case, and indeed in Mojica's case, neither formula would necessarily yield a higher award. Gannett cannot claim that the alternate formula is somehow "unfair" absent such information, when it knew all along that discrimination was illegal. This argument

also applies to the Act's offer of jury trials in Title VII cases.

In this respect, the present case is similar to *Littlefield v. McGuffy,* 954 F.2d 1337 (7th Cir.1992). The jury in *Littlefield* found that McGuffy had intentionally discriminated against a woman because her boyfriend and daughter were black, in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3613. Before trial, the FHA was amended to remove a punitive damages cap. McGuffy argued on appeal that the jury should have been instructed that at the time of his bad acts, the FHA contained the punitive damages cap. We rejected his appeal, in part because a parallel civil rights law (42 U.S.C. § 1982) exposed McGuffy to uncapped liability for the same acts:

> [T]he jury entered a general verdict for the plaintiff and awarded both compensatory and punitive damages without allocating specific amounts for violation of the Civil Rights Act, the Fair Housing Act, or Illinois common law. Under these circumstances, no material injustice was worked on the defendant * * *.

*Id.* at 1345. In today's case, the jury rendered a verdict against Gannett on national origin discrimination without distinguishing between the pre-Act Title VII and post-Act § 1981 grounds. Thus the verdict for Mojica would stand under *Littlefield* unless the new availability of a jury in Title VII cases would wreak a substantial injustice on Gannett. See *Lytle v. Household Manufacturing, Inc.,* 494 U.S. 545, 550, 110 S.Ct. 1331, 1335, 108 L.Ed.2d 504 (1990). And Gannett cannot argue that it is unjust to defend civil suits before a jury instead of a judge without attacking the Seventh Amendment and challenging a major premise of case law following *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938): that juries are "procedural" enough to apply federal jury requirements even where a federal court hears a state-law case in diversity. *Simler v. Conner,* 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963);

---

**11.** *DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377 (10th Cir.1990), failed to take account of Congress' intent as expressed by Section 2 of the Restoration Act.

*Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

It can also be argued that the amount of money employers pay out on successful discrimination lawsuits is insignificant compared to the costs employers incur by answering complaints and generally trying to comply with the civil rights laws. Since the 1991 Civil Rights Act created no new norms against discrimination, Gannett would have had to answer Mojica's claim, defend it at trial, and perhaps pay her damages with or without the Act. Its risk of laying out substantial sums would have been present regardless of how the Act applied to Mojica's case. It would be hard for Gannett to show that the shift towards a perhaps higher award at the end of trial would have induced it to treat Mojica differently, when Gannett knew that discrimination was illegal and so many of the costs associated with that norm (such as compliance and answering complaints) were relatively fixed. In the long run, the Act may encourage more civil rights complaints by making discrimination easier to prove or by offering the prospect of higher awards, thereby increasing the costs of employers like Gannett. But these are speculative, empirical questions that can only be answered over time. When Congress established new procedures and provided in the Act that those procedures should take effect upon enactment of the Act, it cast such questions aside.

In *Luddington,* we aptly characterized circuit court decisions that offered § 1981 damages for job discrimination occurring after contract formation as "a tentative regime, which *Patterson* swept away." 966 F.2d at 229. More pertinent today, however, is my conclusion that *Patterson, Wards Cove* and other cases overruled by the 1991 Civil Rights Act were also a tentative regime, swept away by Congress. Since Congress has expressed its intent, we are bound to respect it. I would affirm the judgment below.

