**Diane M. CRNOKRAK, Plaintiff,**

v.

**EVANGELICAL HEALTH SYSTEMS CORPORATION, et al., Defendants.**

No. 91 C 6769.

United States District Court, N.D. Illinois, E.D.

March 31, 1993.

738

Douglas Robert Stevens, Brian Patrick Liston, Foran & Schultz, Chicago, IL, for plaintiff.

Edward W. Bergmann, Laura R. Garger, Dale Lee Deitchler, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiff Diane Crnokrak (Crnokrak) brings this action against defendant Evangelical Health Systems Corporation (EHS) alleging employment discrimination in violation of the Pregnancy Discrimination Act (PDA) and Title VII, 42 U.S.C. § 2000e *et seq.* Plaintiff claims that she was demoted from a supervisory position with EHS because of her sex—specifically because she was pregnant—and that EHS retaliated against her after she filed a complaint with the Equal Employment Opportunity Commission (EEOC). EHS now moves for partial summary judgment.

## BACKGROUND

In reviewing EHS' motion for partial summary judgment, this court assumes the truth of the facts asserted by Crnokrak. EHS is an Illinois corporation that provides health care services and sells health care products. In February 1990, Crnokrak was employed as an office manager at Midwest Respicare, an operating division of EHS located at 3521 East 106th Street in Chicago, Illinois. She had worked for Midwest Respicare or its parent company, South Chicago Community Hospital, since 1983, having started as a part-time secretary and worked her way up. Crnokrak's duties as office manager included accounting, computer work and, most impor-

tantly, supervision of the drivers, equipment technicians and clerical staff. As a manager, Crnokrak was entitled to a higher salary than those in non-managerial positions. She reported directly to the general manager of the office, Brian Patterson (Patterson).

Although different employees within the office enjoyed different levels of authority, there were few sharp divisions of labor among staff members. Employees often were "cross-trained," and despite Crnokrak's supervisory status she shared duties with several of her subordinates, including Karen Koziarski (Koziarski) and Lisa Chavez (Chavez). A total of fifteen to twenty employees worked at Midwest Respicare, and three of them, Crnokrak, Koziarski and Chavez, handled all of the order-taking for the office.

In approximately September 1989, Crnokrak learned that she was pregnant and promptly informed Patterson. He asked her if she expected to return to work after she had her baby and she said she did—her plan was to return to work as soon as she was physically able and she would not take an extended "maternity leave" as some mothers do to care for their newborn infants. Patterson responded that that was "good enough" for him and congratulated her. Over the next few months they occasionally discussed her plan to take a pregnancy leave. During one conversation Patterson told Crnokrak that she was allowed only two weeks' leave and said that he hoped she would "hurry up and get back" to work after the baby was born. In the same conversation he threw a key chain with a condom attached to it at Crnokrak and said, "Make sure after you have this baby you use this so that we won't have to worry about you going on maternity leave again."

Crnokrak's last day of work before her pregnancy leave was February 16, 1990. She gave birth to a child on March 7, 1990. In April 1990 she returned to the office to pick up her paycheck, and from that point on returned every other week, on alternating Thursdays, when paychecks were issued. During her visits she spoke with many co-workers, including Patterson, none of whom indicated to her that her job was in jeopardy. Unfortunately, her pregnancy leave lasted longer than initially expected because of a post-partum bleeding condition. In late April or early May 1990 Patterson asked her to provide a note from a doctor describing her condition so that she could maintain her eligibility for EHS disability benefits. During that conversation Crnokrak indicated that she would return to work by June 1, 1990, and Patterson responded that that was "fine." On May 8, 1990. when she brought in the note from her doctor, no one told her that she was going to lose her job.

On May 10 or 11, 1990, approximately three weeks before Crnokrak was scheduled to return, Chavez tendered her resignation and two-week notice. Chavez's job involved less responsibility than Crnokrak's, and Chavez's salary was lower than Crnokrak's. Chavez informed various co-workers that she wanted to leave because she felt underpaid, she wanted to spend less time entering data on the office computer, and she had a good job offer elsewhere. On May 17 or 18, 1990, Patterson offered Crnokrak's job to Chavez, effective May 21, 1990. Chavez accepted the offer and decided to remain with EHS.

Crnokrak returned to the office on May 22 or 23, 1990, with a note from her doctor indicating that she could return to work on May 29, 1990. When she arrived Patterson informed her that he had given her job to Chavez. He told her that she had been "in the wrong place at the wrong time," and that had she not been out on pregnancy leave she would not have been replaced. He also indicated he had heard a rumor that she was not going to return. He then offered her Chavez's old job. Crnokrak subsequently was advised that there were no jobs then available at EHS that were comparable in salary to the one she had lost. On July 18, 1990, Crnokrak's employment with EHS was terminated because she refused to accept Chavez's old job with its concomitant reduction in pay.

According to EHS, the company was short-staffed during Crnokrak's disability leave and was compelled to offer her position to Chavez in order to persuade Chavez to stay. Had EHS lost Chavez, explains the company, Koziarski would have had to do the work of three people. Moreover, Koziarski

had never been trained to operate the computer. Crnokrak disputes the company's explanation for her demotion. Noting that EHS never hired temporary help to fill in for her while she was on pregnancy leave, she alleges that Chavez and Koziarski had not been overburdened. She also places considerable weight on the statement of Chavez herself that it was not necessary for the company to retain her. The company concedes that Crnokrak's job performance had been good.

Crnokrak also alleges that EHS failed to observe official company policy when it demoted her. Under EHS policy then in effect, the company was required to take temporary measures, if possible, before filling a position held by an employee on disability leave. In consultation with the EHS human resources director, the department manager was supposed to attempt to cover the duties and responsibilities of the absent employee through reassignment of duties, hiring of temporary employees, or other means. The human resources director could authorize the replacement of the employee on leave, but only if there was a business necessity to do so. Crnokrak asserts that standard job-posting and candidate interviewing procedures were not followed when EHS decided to promote Chavez into her position, and that Patterson and the human resources director, Mark Senesac (Senesac) never discussed the possibility of hiring temporary help. When Crnokrak reported what had happened to the EHS corporate director of management planning and recruitment, David Anderson (Anderson), Anderson responded that Patterson's actions were "outrageous."

On May 29, 1990, before she was terminated, Crnokrak filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). She contends that, in retaliation for her filing the complaint, the company refused to give her severance benefits to which she was entitled. Ultimately, the EEOC found that the evidence obtained during its investigation did not establish discrimination on the basis of pregnancy. On October 24, 1991, Crnokrak filed her complaint in this court.

## DISCUSSION

Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*, provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2.

Title VII prohibits employment discrimination on the basis of gender, but in *Gilbert v. General Electric Co.*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the United States Supreme Court held that the statute did not bar employment discrimination on the basis of pregnancy. Because not all women become pregnant, said the Court, discrimination against pregnant employees need not amount to discrimination against female employees. *Id.* at 135, 97 S.Ct. at 407–08. The Court's decision was severely criticized and in the Pregnancy Discrimination Act of 1978 (the PDA) Congress rejected the Court's position. The PDA added language to the definitions section of Title VII. The PDA provides:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, *because of or on the basis of pregnancy, childbirth, or related medical conditions;* and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other

persons not so affected but similar in their ability or inability to work.... 

42 U.S.C. § 2000e(k).

The enactment of the PDA left open many important questions concerning employers' ability to consider pregnancy when making employment decisions. The PDA contains two principal clauses which, when read independently, could lead to contradictory results in some cases. The PDA first states that the "terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." Because short-term inability to work is a medical condition virtually inherent in pregnancy and childbirth, the first clause could be construed as barring discrimination against employees who are temporarily absent from work for medical reasons related to pregnancy and childbirth. Crnokrak was such an employee, and she argues that the PDA does just that. The second clause provides, however, that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same ... as other persons not so affected but similar in their ability or inability to work...." That clause could be read to indicate that, as long as pregnant employees are treated no worse than other disabled employees, an employer is permitted to treat disabled pregnant employees worse than it treats non-disabled employees who are able to work without interruption. EHS proffers a defense along those lines, asserting that Crnokrak was demoted because she was out of the office, not because she was pregnant.

■ To resolve the quandary created by the seemingly irreconcilable interpretations that the two clauses generate, this court looks to the broader principles that underlie Title VII. The PDA, after all, is part of the definitions section of Title VII, and takes effect through the substantive sections of the general anti-discrimination statute. *Scherr v. Woodland School Community Consolidated Dist. No. 50.,* 867 F.2d 974, 978 (7th Cir.1988). It is well established that Title VII prohibits acts and policies that discriminate by their very terms, as well as acts and policies that, while facially non-discriminatory, have a disproportionately adverse effect

against women. *Id.* at 979. The PDA did not alter that general framework.

■ Thus, if a plaintiff can prove that she lost her job, or certain benefits of employment, because of her employer's antipathy toward her pregnancy, or because her employer has enacted a policy that explicitly treats pregnancy differently from other disabling conditions, she has made out a "disparate treatment" claim under Title VII. *See e.g., Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148 (1st Cir.1990) (affirming finding of pregnancy discrimination against unmarried employee who was discharged after her pregnancy became visible); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (finding violation of PDA when employer explicitly barred fertile women from holding specified jobs). And if a plaintiff can prove that she lost her job, or certain benefits of employment, because of an employer's disability leave policy that exposes women to a greater risk of dismissal or demotion than men, then the plaintiff has made out a "disparate impact" claim under Title VII. *See e.g., Abraham v. Graphic Arts International Union,* 660 F.2d 811, 819 (D.C.Cir.1981); *see also Maganuco v. Leyden Community High School Dist. 212,* 939 F.2d 440, 445 (7th Cir.1991). Another formulation, suggested by a noted scholar, is that employment discrimination occurs when women who decide to have children are penalized in the workplace and men who decide to have children are not. *See* Herma Hill Kay, *Equality and Difference: the Case of Pregnancy,* 1 Berkeley Women's L.J. 1, 21–31 (1985).

Looking at the second clause of the PDA, one might infer that disability leave policies are immune from attack under Title VII if they treat all disabilities identically. If that were so, however, then the PDA would have expanded the rights of some pregnant women asserting disparate treatment claims only to abrogate the rights of other pregnant women asserting disparate impact claims. Prior to the PDA's enactment, in the *Gilbert* decision the Supreme Court acknowledged

the possibility of establishing disparate impact claims based on benefits policies toward pregnant women. 429 U.S. at 137, 97 S.Ct. at 408–09. In fact, although *Gilbert* produced five opinions, the justices were unanimous on that point. *See id.* at 146, 97 S.Ct. at 413 (Stewart, J., concurring); *id.* at 146, 97 S.Ct. at 413 (Blackmun, J., concurring in part); *id.* at 155, 97 S.Ct. at 417–18 (Brennan, J., dissenting); *id.* at 161, 97 S.Ct. at 420 (Stevens, J., dissenting). Given that the PDA was designed to " 'guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life,' " *California Federal Savings and Loan Ass'n v. Guerra,* 479 U.S. 272, 289, 107 S.Ct. 683, 693–94, 93 L.Ed.2d 613 (1987) (quoting 123 Cong.Rec. 29658 (1977) (remarks of Sen. Williams)), it is hardly possible that Congress sought to strip pregnant women of rights that they formerly had been granted. Thus, the legislative history of the PDA, as well as the history of Title VII in general, establish that Congress understood that in some cases "equality cannot be achieved by treating identically those who are not alike." Melissa Feinberg, "After *California Federal Savings & Loan Association v. Guerra:* the Parameters of the Pregnancy Discrimination Act," 31 Ariz.L.Rev. 141, 146 (1989). *See also Scherr,* 867 F.2d at 979.

Crnokrak makes what amount to three distinct charges against EHS. First, she claims that she was terminated as a result of "discriminatory actions" by EHS. That, in essence, is a disparate treatment claim. Second, she claims that she was terminated as a result of EHS' "discriminatory policies." The court understands that allegation to be a disparate impact claim because she mentions no EHS policies that by their express terms treat pregnant workers differently from others. Third, Crnokrak asserts that in response to her filing a claim with the EEOC, the company denied her severance benefits

to which she was entitled. That is a retaliatory treatment claim.

The motion submitted by EHS pertains only to Crnokrak's discrimination claims, not to her retaliation claim.[1] Oddly, although EHS devotes only one sentence in its briefs to Crnokrak's disparate impact allegation, Crnokrak responds by denying that she ever made such a claim. Notwithstanding the language in her complaint concerning "discriminatory policies," Crnokrak states in her brief that her "claim is that EHS' actions— not its policy—were violative of Title VII." Crnokrak's disavowal of her "discriminatory policies" allegation creates a strong temptation to dismiss the disparate impact claim without further discussion, but the matter is complicated by her repeated assertion that a Title VII violation occurs whenever a nonpregnant employee is given the position of a pregnant employee because the pregnant employee is out on pregnancy leave. In essence, Crnokrak claims that if an employee is absent due to pregnancy, Title VII demands that her employer pretend she is present. As already noted, there are cases suggesting that women cannot be penalized for reasonable absences due to pregnancy, but those cases involve disparate impact claims, not disparate treatment claims. Therefore, to prevent further confusion and to set matters straight, both types of discrimination claims are addressed in this memorandum and order.

*Disparate Treatment Arguments*

Both parties view the case through the prism of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the case that established the burden-shifting method of proving disparate treatment claims under Title VII. To establish a *prima facie* case under *McDonnell Douglas,* a discharged or demoted person alleging pregnancy discrimination would have to prove (1) that she was pregnant (or

---

1. Crnokrak notes that the discrimination and retaliation allegations are contained within a single count in her complaint and therefore proposes that all of her charges be treated as a single claim. Her motivation for making that argument is not clear. Perhaps she hoped to foreclose the possibility of further motions for summary judgment by the defendant. In any event, because the claims are logically distinct, this court will treat each claim separately, notwithstanding the format that the plaintiff happens to have chosen for her complaint. Accordingly, no view is expressed on the merits of Crnokrak's retaliation claim.

capable of becoming pregnant); (2) that she was performing her job well enough to meet her employer's legitimate expectations; (3) that in spite of her performance she was discharged or demoted, and (4) that others who were not pregnant (or were incapable of becoming pregnant) were treated more favorably. Crnokrak meets that initial burden. EHS does not dispute that Crnokrak was pregnant or that her job performance was satisfactory. She was demoted despite her satisfactory performance and was replaced by Chavez, a non-pregnant employee.

Under *McDonnell Douglas*, once the employee has alleged a *prima facie* case the burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for the employee's discharge or demotion. EHS meets that burden by alleging that Crnokrak was demoted not because she was pregnant but because she was absent from work. A crisis had arisen, namely, Chavez's threat to leave, and the only way to address it was to give away Crnokrak's job. With that explanation EHS meets its burden of production.

■ Crnokrak contends that EHS' explanation "is simply not a non-discriminatory reason" because it involves a decision to treat a non-pregnant person better than a pregnant woman. What Crnokrak fails to appreciate is that the PDA does not force employers to pretend that absent employees are present whenever their absences are caused by pregnancy. *See Zoleke v. CNA Insurance Companies*, 1992 WL 175526 (N.D.Ill.). According to EHS, Crnokrak's absence and Chavez's short-term indispensability were the only factors it considered in deciding to demote Crnokrak. To be sure, unlawful discrimination may be inferred if pregnancy plays a role in an adverse employment decision, but here defendant claims that pregnancy, as such, played no role at all.

Once the employer has stated a legitimate reason for its decision, the plaintiff employing the *McDonnell Douglas* method of proof must offer evidence that the employer's explanation is pretextual. Unlike the plaintiff in *Zoleke*, Crnokrak meets that burden. She contends that the alleged crisis facing the department did not exist and that the depart-

ment would have gotten by even without Chavez. Both assertions are supported by statements of EHS employees. In any event, she says, she would have returned to the office before her doctor cleared her to work had she been asked to do so. Moreover, only one week separated the date of Chavez's scheduled departure from the date of Crnokrak's scheduled return. A finder of fact reasonably could infer from the timing of the events alone that EHS' explanation was pretextual.

Most significant, perhaps, is Crnokrak's allegation that her supervisor, Patterson, was hostile to pregnant employees. On one occasion he threw a key chain with a condom attached to it at her and urged her to "make sure after you have this baby you use this so that we won't have to worry about you going on maternity leave again." His gesture and comment may have been perfectly innocent, but they also may have reflected agitation at Crnokrak's pregnancy, or his fear that if she became pregnant once she would become pregnant again. Crnokrak also alleges that Patterson did not follow company procedures that were in place to deal with contingencies like emergency staff shortages when he decided to give away her job. A senior EHS official described his actions as "outrageous." Patterson's dispensing with company protocol may have been necessary in light of the dire staffing problem that he perceived, but it also may have been prompted by a desire to avoid formal review by his superiors of a discriminatory decision. This court may not attempt to divine the true motives behind his statements and actions on a motion for summary judgment.

Citing *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989), EHS argues that "stray remarks" cannot be used to demonstrate the use of illegitimate criteria by an employer. Quite aside from the fact that Crnokrak relies on more than the remarks of company officials to meet her burden, that argument misses the point of the *Smith* case. *Smith* deals primarily with the allocation of burdens of proof in so-called "mixed-motive" cases, cases in which the burden-shifting analysis of *McDonnell Douglas* does not apply. The issue in a "mixed-mo-

tive" case is not whether the plaintiff can prove that the employer's explanation for its behavior is pretextual. Rather, the issue is whether the employer can prove that it would have acted the same way toward the plaintiff had it not allowed antipathy toward the protected class to affect the decisionmaking process.[2] *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989). In mixed-motive cases the burden of persuasion, not just the burden of production, shifts to the employer.

*Hopkins* establishes that the burden of persuasion will shift to the employer *only* if a plaintiff initially proves with direct evidence that animosity toward the protected class played a role in the employment decision. In affirming a directed verdict issued against a plaintiff who claimed that the burden of persuasion had shifted to the defense, the *Smith* court stated that "stray discriminatory remarks" made by certain company officials were not enough, by themselves, to cause the burden of persuasion to shift to the defendant. 875 F.2d at 1328–30. The court did not hold, as EHS might have it, that biased statements by an employer are never enough to show pretext under *McDonnell Douglas.* The court did address the sufficiency of the plaintiff's evidence under *McDonnell Douglas,* but in ruling for the defendant it ex-

plained that the comments attributed to the plaintiff's supervisor could not "rebut the weight of the detailed and documented testimony" concerning the plaintiff's "poor" and "sharply deteriorating" job performance. *Id.* at 1330. In that critical respect, *Smith* was very different from the case now before the court, in which the defendant's explanation for its decision is aggressively contested and the plaintiff's skillful job performance is undisputed. Accordingly, Crnokrak must be allowed to proceed with her claim.[3]

## Disparate Impact Arguments

■ EHS does not deny that Crnokrak's pregnancy was the "but for" cause of her demotion. She would not have been absent from work but for her pregnancy, and she would not have been demoted but for her absence. Under disparate treatment analysis, however, "but for" causation will not create liability unless it is accompanied by evidence of intentional discrimination. Disparate impact analysis can yield a different result even without such proof, as it did in *Abraham,* 660 F.2d at 819, because liability under a disparate impact theory does not require proof of intent to discriminate. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). But in this case, as Crnokrak virtually admits with her

**2.** The substantive rules governing mixed-motive cases have been altered by the passage of the Civil Rights Act of 1991, which provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). As noted in an earlier memorandum and order issued in this case, however, the substantive changes in the law (and, probably, procedural changes as well) are not to be applied retroactively. *Crnokrak v. Evangelical Health Services,* 1992 WL 317208 (1992). *See also Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225 (1992), *pet. for cert. filed,* 61 U.S.L.W. 3446 (1992); *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (1992), *cert. den.* —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992); *Mojica v. Gannett Co., Inc.,* 986 F.2d 1158 (7th Cir.1993) (agreeing to resolve a dispute concerning the retroactivity of the Civil Rights Act of 1991 *en banc* ).

**3.** Ironically, although both parties analyze this case under the *McDonnell Douglas* framework, it

may be more suited for analysis under *Hopkins.* The burden-shifting method of proof found in *McDonnell Douglas* applies only when a plaintiff is unable to come forward with direct evidence that animus against a protected class of employee affected the employment decision in dispute. *Hopkins,* 490 U.S. at 246–47, 109 S.Ct. at 1788–89. Crnokrak offers evidence that the person who made the decision to demote her was unhappy with her pregnancy. He explicitly told her that had she not taken pregnancy leave she would not have been demoted. *Cf. Randle v. Lasalle Telecommunications, Inc.,* 876 F.2d 563, 569 (7th Cir.1989) (noting courts' difficulty in determining whether evidence is "direct" or "indirect"). Given Crnokrak's evidence, one could argue that the burden of persuasion must shift to EHS to prove that its employment decision would have been the same absent the discriminatory attitude of some of its officials. *Hopkins,* 490 U.S. at 242, 109 S.Ct. at 1786. Crnokrak's claim certainly would survive with the burdens of proof so allocated but, since her claim survives under the *McDonnell Douglas* standard as well, the different allocation of burdens mandated by *Hopkins* is of no consequence in this case, on this motion.

formal abandonment of her "discriminatory policies" claim, the evidence cannot support a disparate impact claim.

Crnokrak identifies no specific practice that generally affects women unfavorably, and she offers no statistics to suggest that women as a group suffer adverse employment consequences from the EHS disability policies. Title VII and the PDA are designed to "put an end to an unrealistic and unfair system that forces women to choose between family and career," 124 Cong.Rec. 21442 (1978) (remarks of Rep. Tsongas) (quoted with approval in *California Federal Savings and Loan Ass'n v. Guerra*, 479 U.S. 272, 286 n. 19, 107 S.Ct. 683, 692 n. 19, 93 L.Ed.2d 613 (1987)), but there is no allegation that the EHS system forced such a choice on its female employees. Crnokrak concedes that her absence was unusually long, and there is no indication that typical mothers-to-be were burdened significantly by the leave limitations that EHS imposed. *Cf. Abraham*, 660 F.2d at 819. Without additional evidence, the fact that a more generous pregnancy leave policy might have saved her job is not enough to support a discrimination claim. Crnokrak's statements to the contrary notwithstanding, the fact that she was replaced by a non-pregnant employee while she was on pregnancy leave does not automatically establish EHS' liability under Title VII.

## CONCLUSION

For the foregoing reasons, Crnokrak is entitled to proceed on her disparate treatment claim under Title VII and the Pregnancy Discrimination Act.